FILED

## UNITED STATES DISTRICT COURT
### FOR THE
## MIDDLE DISTRICT OF FLORIDA

2010 MAY 17 P 9: 39

MARK F. BAILEY; GAY L. BAILEY; STEVEN R. BREDAHL; ANDREA
P. BREDAHL; DAVID JANKOWSKI; KEVIN CRAWFORD; TROY A.
DOMNICK; LAUREN K. DOMNICK; EDWARD R. WEBB; JAMES W.
JACKSON; BERNARD J. SHAUGHNESSY, JR.; FREDERICK A. REEPING;
BEACHFRONT HOLDINGS & INVESTMENTS, LTD; CLEAR REEF
PROPERTIES, LTD; KENNETH W. LILES; PATRICIA M.  LILES; JAMES
JOSEPHSON; WILLIAM J. ANDREWS, JR.; MARK R. ROODVOETS; JON D.
ANDREWS; CHARLES B. LESESNE; JERRY A. CICOLANI, JR.; KRIS
BRENNEMAN; SUSAN KHERKHER; THOMAS E. LAMMERTSEE; MARY L.
SIPSKI; RONALD P. VAN as trustee of the Ronald P. Van Jr. Revocable Trust;
KATHY JO VAN, as Trustee of the Kathy Jo Van Revocable Trust,

|                     | Plaintiffs, | Case No. |
| vs.                 |             | 3:10-cv-422-4-32 JRK |

DEFENDANTS ERG ENTERPRISES, LP; LUBERT-ADLER MANAGEMENT
COMPANY, LP; LUBERT-ADLER REAL ESTATE FUND III, LP; LUBERT-ADLER
REAL ESTATE PARALLEL FUND III, LP; LUBERT-ADLER CAPITAL REAL
ESTATE FUND III, LP; LUBERT-ADLER REAL ESTATE FUND IV, LP;
LUBERT-ADLER REAL ESTATE PARALLEL FUND IV, LP; LUBERT-ADLER
CAPITAL REAL ESTATE FUND IV, LP; LUBERT-ADLER REAL ESTATE
FUND V, LP; LUBERT-ADLER REAL ESTATE PARALLEL FUND V, LP;
LUBERT-ADLER CAPITAL REAL ESTATE FUND V, LP; GINN WEST END
GP, LLC; GINN-LA WEST END LTD, LLLP; GINN-LA CS BORROWER, LLC;
GINN-LA CONDUIT LENDER, INC.; GINN-LA CS HOLDING COMPANY;
GINN-LA OBB, LIMITED- CORP; GINN FINANCIAL SERVICES; BAHAMAS
SALES ASSOCIATE, LLC; GINN TITLE SERVICES, LLP; WILLIAM
MCCRACKEN; EDWARD R. GINN, III; JOHN DOES 1-15,

Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

PLAINTIFFS, for their Complaint herein, allege as follows:

## JURISDICTION

1.    This Court has jurisdiction in this action pursuant to 28 U.S.C. § 1331 and 18

1

U.S.C. § 1964(a) and (c).

2.     This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the state common-law claims alleged herein.

3.     This Court has personal jurisdiction over the Defendants and each of them pursuant to 18 U.S.C. §§ 1965(a) and (d).  This Court has personal jurisdiction over the Defendants and each of them because at all times relevant to this Complaint, Defendants, either individually or through their agents, officers or representatives, engaged in and carried on business activities in the State of Florida relating to the allegations herein; maintained business offices in the State of Florida; committed statutory violations within the State of Florida, as alleged herein; and caused injuries to Plaintiffs that arose out of acts or omissions that occurred within the State of Florida, as alleged herein.

## VENUE

4.     Venue for this action is appropriate in this Court under 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims herein occurred in this district and division, and because several of the Defendants reside and/or transact business in this district and division.

## THE PARTIES

5.  Plaintiffs Mark F. Bailey and Gay L. Bailey ("Bailey") are and, at all times relevant to the allegations herein, were residents of the State of Florida who purchased an undeveloped parcel of real property in the Ginn Sur Mer subdivision on Grand Bahama Island ("GSM" or the "GSM Subdivision").

2

6.  Plaintiffs Stephen R. Brehahl and Andrea P. Bredahl ("Bredahl") are and, at all times relevant to the allegations herein, were residents of the State of New Jersey who purchased an undeveloped parcel of real property in GSM.

7.  Plaintiffs Kevin T. Crawford and David P. Jankowski (collectively "Crawford Group") are and, at all times relevant to the allegations herein, were residents of the State of Michigan who purchased an undeveloped parcel of real property in GSM.

8.  Plaintiffs Troy A. Domnick and Lauren K. Domnick ("Domnick") are and, at all times relevant to the allegations herein, were residents of the State of Wisconsin who purchased an undeveloped parcel of real property in GSM.

9.  Plaintiffs James W. Jackson, Bernard J. Shaughnessy Jr., and Frederick A. Reeping (collectively "Jackson Group") are and, at all times relevant to the allegations herein, were residents of the State of Pennsylvania who purchased an undeveloped parcel of real property in GSM.

10.  Plaintiff Beachfront Holdings & Investments, Ltd. is a Bahamian corporation formed for the purpose of purchasing two undeveloped parcels of real property in GSM.

11.  Plaintiff Clear Reef Properties, Ltd. is a Bahamian corporation formed for the purpose of purchasing an undeveloped parcel of real property in GSM.

12.  Plaintiff Edward R. Webb ("Webb") is and, at all times relevant to the allegations herein, was a resident of the State of Georgia who purchased an undeveloped parcel of real property in GSM.

13.  Plaintiffs Kenneth W. Liles and Patricia M. Liles ("Liles") are and, at all times relevant to the allegations herein, were residents of the State of Florida who purchased an undeveloped parcel of real property in GSM.

14.   Plaintiff James Josephson ("Josephson") is and, at all times relevant to the allegations herein, was a resident of the State of New York who purchased an undeveloped parcel of real property in GSM.

15.   Plaintiff William J. Andrews, Jr. ("W. Andrews") is and, at all times relevant to the allegations herein, was a resident of the State of South Carolina.  Plaintiff Mark R. Roodvoets ("Roodvoets") is and, at all times relevant to the allegations herein, was a resident of the State of South Carolina.  Plaintiff Jon D. Andrews ("J. Andrews") is and, at all times relevant to the allegations herein, was a resident of the State of South Carolina.  Plaintiff Charles B. Lesesne ("Lesesne") is and, at all times relevant to the allegations herein, was a resident of the State of Florida.  Plaintiffs W. Andrews, Roodvoets, J. Andrews and Lesesne (collectively "Andrews Group") together purchased an undeveloped parcel of real property in GSM.

16.   Plaintiffs Jerry A. Cicolani, Jr. and Kris Brenneman (collectively "Cicolani Group") are and, at all times relevant to the allegations herein, were residents of the State of Ohio who purchased an undeveloped parcel of real property in GSM.

17.   Plaintiff Susan C. Kherkher ("Kherkher") is and, at all times relevant to the allegations herein, was a resident of the State of Texas who purchased an undeveloped parcel of real property in GSM.

18.   Plaintiffs Thomas E. Lammertsee and Mary L. Sipski ("Lammertsee") are and, at all times relevant to the allegations herein, were residents of the State of New Jersey who purchased an undeveloped parcel of real property in GSM.

19.   Plaintiffs Ronald P. Van, as trustee of the Ronald P. Van Jr. Revocable Trust u/a/d August 25, 2006 and Kathy Jo Van, as Trustee of the Kathy Jo Van Revocable

4

Trust u/a/d August 26, 2006 ("Van") are and, at all times relevant to the allegations herein, were residents of the State of Illinois who purchased an undeveloped parcel of real property in GSM.

20.   Defendant Lubert-Adler Management Company, LP d/b/a Lubert-Adler Partners, LP ("Lubert-Adler") is a Delaware limited partnership with its principal place of business in Philadelphia, PA.  Defendant Lubert-Adler is a private-equity fund management company that invests and participates in real estate development projects.  As of mid-2006, Defendant Lubert-Adler had invested over $800 million in Ginn development projects.  Defendant Lubert-Adler is the ultimate parent company of Defendants Lubert-Adler Real Estate Fund III, LP; Lubert-Adler Real Estate Parallel Fund III, LP and Lubert-Adler Capital Real Estate Fund III, LP (collectively "Lubert-Adler Funds III"); Lubert-Adler Real Estate Fund IV, LP; Lubert-Adler Real Estate Parallel Fund IV, LP and Lubert-Adler Capital Real Estate Fund IV, LP (collectively "Lubert-Adler Funds IV"); Lubert-Adler Real Estate Fund V, LP; Lubert-Adler Real Estate Parallel Fund V, LP and Lubert-Adler Capital Real Estate Fund V, LP (collectively "Lubert-Adler Funds V").  Defendants Lubert-Adler Funds III, IV and V each held an 80% equity interest in the Ginn entities in which those Funds were invested, including but not limited to Defendants Ginn-LA CS Borrower, LLC; Ginn-LA CS Holding, Ginn-LA West End LLLP and Ginn-LA Conduit Lender (collectively Ginn-LA Entities").  Defendant Lubert-Adler had control of the Ginn-LA Entities.  At all material times hereto, Defendant Lubert-Adler knew of, managed, controlled, ratified and/or participated in the actions of the Defendant Ginn-LA Entities named herein.  Defendant Lubert-Adler, through Dean Adler, had actual knowledge or knowledge fairly implied on the basis of objective

circumstances, of the acts of the Defendant Ginn-LA Entities named herein, as well as of the acts of Bobby Ginn.

21.   Defendant Ginn West End GP, LLC ("Ginn West End") is a Georgia limited liability company formed on October 28, 2004, with its principal place of business located in Palm Coast, Florida.

22.   Defendant Ginn-LA West End Ltd, LLLP ("Ginn-LA West End LLLP") is a Georgia limited liability limited partnership formed on November 2, 2004, with its principal place of business located in Palm Coast, Florida.

23.   Defendant Ginn-LA CS Borrower, LLC ("Ginn-LA CS Borrower") is a Delaware limited liability company formed on April 18, 2006, with its principal place of business located in Palm Coast, Florida.

24.   Defendant Ginn-LA Conduit Lender, Inc. ("Ginn-LA Conduit Lender") is a Delaware corporation formed on May 5, 2006, with its principal place of business located in Celebration, Florida.

25.   Defendant Ginn-LA OBB, Limited-Corp. ("Ginn-LA OBB") is a Bahamian corporation formed on December 21, 2006, with its principal place of business located in Palm Coast, Florida.

26.   Defendant ERG Enterprises, LP ("ERG Enterprises") is a Georgia limited partnership formed on December 29, 2005, with its principal place of business located in Palm Coast, Florida.

27.   Defendant Ginn Financial Services, LLC ("Ginn Financial") is a Georgia Limited Liability Company formed on June 10, 2005, with its principal place of business located in Palm Coast, Florida.

28.  Defendant Bahamas Sales Associate, LLC ("Bahamas Sales") is a Delaware corporation formed on August 4, 2006 with its principal place of business located in Palm Coast, Florida.

29.  Defendant Ginn Title Services, LLC ("Ginn Title") is a Georgia Limited Liability Company formed on September 13, 2005 with its principal place of business located in Palm Coast, Florida.

30.  Upon information and belief, Defendant William McCracken ("William McCracken") resides in the State of Florida.  At certain times relevant to the allegations herein, Defendant William McCracken has served as an officer of Defendant Ginn Financial.

31.  Defendant Edward R. ("Bobby") Ginn, III ("Bobby Ginn") resides at 42 Island Estates Parkway, Palm Coast, Florida 32137.  At certain times relevant to the allegations herein, Defendant William McCracken has served as an officer of Defendant Bahama Sales Associate.

32.  Each Defendant is sued individually as a primary violator and as an aider and abettor.  In acting to aid and abet the commission of the fraud and other wrongful conduct complained of herein, each Defendant acted with an awareness of the fraud and other wrongful conduct.  Each Defendant rendered substantial assistance or encouragement to the accomplishment of that fraud and was aware of its overall contribution to the conspiracy, scheme, and common course of wrongful conduct alleged herein.

33.  Each Defendant is joined in this action as a co-conspirator.  Liability arises from the fact that each Defendant entered into an agreement with the other Defendants to

commit or to participate in the commission of all or part of the unlawful acts, plans, schemes, transactions and artifices to defraud described above.

## FACTUAL BACKGROUND: Credit Suisse Credit Facility Fraud

**I.**    **August 2005:  Ginn-LA International Business Company Buys the GSM Land for  $ 24.5 Million**

34.  Ginn-LA International Business Company, Ltd. ("GLA-IBC") is a Bermuda International Business Company that is the immediate parent company for the initial developer of GSM:  Ginn-LA West End Limited.

35.  Pursuant to an August 17, 2005 Stock Purchase Agreement, GLA-IBC purchased all of the outstanding capital stock of Grand Bahama Hotel Company ("GBHC"), including land owned by GBHC and GBHC's option on additional acreage. GLA-IBC thereby acquiring 1957 acres of property located in the Settlement of West End on Grand Bahama Island ("GSM Land") for $24.5 million.

**II.**    **August 2005:  Initial Developer Ginn-LA West End Limited Enters into a Heads of Agreement with the Bahamian Government for GSM**

36.  On December 9, 2005, Ginn-LA West End Limited, as the initial developer of GSM, entered into a Heads of Agreement with the Bahamian government.  The Heads of Agreement provided Ginn-LA West End Limited with generous concessions on transfer taxes, duties, work permits and a host of other governmental cooperation.

37.  The Heads of Agreement stated that Ginn-LA West End Limited intended to master develop 1,957 acres of real property on the western side of Grand Bahama Island into a resort community.

38.  The Heads of Agreement stated, "The parties recognize that timing is critical, as to commencement and timely completion of all phases of the Project . . ."

39.   The Heads of Agreement stated, "The Developer intends to sell residential lots and units within the Project prior to the installation of the Project's infrastructure.  These pre-sales are an important part of the sales and marketing of the Project."

40.   The Heads of Agreement stated, "The beneficial owners of the Development are Edward R. Ginn, III and private investments funds which are controlled by Dean Adler and Ira Lubert."

### III.   June 8, 2006: Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender Close the $675 Million Credit Suisse Credit Facility and Distribute $510 Million

### A.   The Credit Suisse Syndicated Term Loan Was A New and Unique Loan Product Offered By Credit Suisse

41.   Around early 2005, Credit Suisse began marketing a new loan product referred to as a syndicated term loan.

42.   One entity that took out the Credit Suisse syndicated term loan was the Yellowstone Mountain Club in Montana ("Yellowstone").  Sometime after it received its Credit Suisse loan, Yellowstone fell into bankruptcy.  In Adversary Proceedings in the Yellowstone bankruptcy (U.S. Bankruptcy Court for the District of Montana, Case No. 09-00014), the Court issued a June 11, 2009 Memorandum of Decision (Doc. No. 292) that set forth the following facts:

a.   "In or around December of 2004, Jeffrey Barcy ("Barcy"), a Director in Credit Suisse's Investment Banking Division, made several attempts to send Blixseth [an owner of Yellowstone] and his secretary or assistant emails that contained a two to three-page teaser, providing Blixseth with a brief overview of Credit Suisse and its new loan product referred to as a syndicated term loan, which was described to

Blixseth as something akin to a 'home-equity loan.'" (Yellowstone Memorandum of Decision at 22.)

b. "Credit Suisse was specifically trying to 'break new ground with a product by doing real estate loans in the corporate bank loan market.' Through its new syndicated term loans, Credit Suisse was able to offer a loan product the size of which had previously been unavailable to borrowers." (*Id.* at 22-23.)

c. "Barcy testified that Credit Suisse's syndicated loan product had previously been marketed to other master-planned residential and recreational communities such as Tamarack Resort, Promontory, Ginn, Turtle Bay, and Lake Las Vegas. Each of the above entities received a syndicated loan from Credit Suisse's Cayman Islands branch, which allowed the equity holders in said entities to take sizeable distributions from all or part of the Credit Suisse loan proceeds." (*Id.* at 23.)

d. "Similar to the syndicated loans to Tamarack Resort, Promontory, Ginn, Turtle Bay and Lake Las Vegas, the Yellowstone Club Credit Agreement was originally drafted to provide that the proceeds of the loan would be used, in part, for 'distributions' to members of the Borrow for purposes unrelated to the Yellowstone Development." (*Id.* at 24.)

e. "As previously noted, the transfer of loan proceeds out of the Yellowstone Club was a key feature of the product that Credit Suisse used to sell the loan. Yankauer testified that the cornerstone of this loan product was that it allowed preferred resort owners, such as Blixeth, to capitalize on the value of their asset." (*Id.* at 28.)

43.  Prior to the Yellowstone Club obtaining its Credit Suisse loan, GSM was retained to conduct an appraisal of the Yellowstone Club property.  GSM's appraisal was based upon future cash flow projections provided by the Yellowstone Club.

**B.  Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender Secretly Obtain the $675 Million CSCF**

44.  In late 2005 or early 2006, Credit Suisse contacted either Bobby Ginn or Defendant Lubert-Adler to offer Ginn and Lubert-Adler the opportunity to take out one of Credit Suisse's new Syndicated Term Loans.

45.  Bobby Ginn, Dean Adler, or both of them, had a series of communications with Credit Suisse concerning whether, and on what terms, Ginn and Defendant-Lubert-Adler might take out one of Credit Suisse's new Syndicated Term Loans.

46.  On March 30, 2006, Defendant Ginn-LA West End LLLP executed an "Engagement Letter" with Credit Suisse "in connection with seeking senior secured credit facilities in an aggregate principal amount of up to $[800,000,000]."

47.  Based on his education, background and extensive experience in the real estate investment field, Dean Adler knew that the Syndicated Term Loan offered by Credit Suisse was a new and unique loan product, the size, terms and structure of which had never before been available to borrowers.

48.  Defendants Lubert-Adler, Lubert-Adler Funds III and IV, ERG Enterprises, Ginn West End and Ginn-LA West End LLLP caused Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender to be formed for the purpose of serving as the borrowers (collectively "CSCF Borrowers) under a $675 million credit facility with Credit Suisse in the spring of 2006 ("CSCF").

49.   Defendants Lubert-Adler, Lubert-Adler Funds III and IV, ERG Enterprises and Ginn-LA West End LLLP caused Defendants CSCF Borrowers to enter into the $675 million CSCF so that Defendants Lubert-Adler and ERG Enterprises could take a $333 million distribution from the proceeds of the CSCF.

50.   Defendants CSCF Borrowers mandated Credit Suisse to act as sole arranger for the CSCF.

51.   In connection with their efforts to obtain the $675 Million CSCF, Defendants CSCF Borrowers submitted information to the rating agency Standard & Poor's. In a May 16, 2006 publication entitled, "Research Update: Issuer Credit, Bank Loan Ratings Assigned to Ginn-LA CS Borrower and Ginn-LA Conduit Lender," Standard & Poor's reported on the $675 Million CSCF.

52.   Plaintiffs were not subscribers to Standard & Poor's and thus did not become aware of Standard & Poor's reports on the CSCF until after August 2008.

53.   Standard & Poor's reported that the $675 Million CSCF was comprised of a $385 million first-lien term loan, a $165 million first-lien synthetic revolving credit facility, and a $125 million second-lien term loan.

54.   Standard & Poor's reported that Defendants CSCF Borrowers were "single-purpose entities formed to recapitalize five limited liability partnerships that each control a master-planned resort community" (collectively the "CSCF Projects"):

a.   Tesoro, a mature community in Port St. Lucie, Florida;

b.   Quail West, a mature community located in Naples, Florida;

c.   Hammock Beach River Club, located in Palm Coast, Florida;

d. Laurelmor, a planned development in the Blue Ridge Mountains of North
Carolina; and

e. The GSM Subdivision on Grand Bahama Island.

55. Standard & Poor's reported that substantially all of the assets of Defendants
CSCF Borrowers and each subsidiary guarantor, including all land and improvements,
secure the loans.

56. Standard & Poor's reported that "[u]nder cash flow projections, which are
supported by GSM appraisals, all debt is expected to be repaid by the end of 2008."

57. The May 16, 2006 Standard & Poor's report also noted the following with
respect to GSM:

a. Two of the communities, Laurelmor and GSM, "are more speculative in nature
with substantially less investment in completed infrastructure and less applicable
sales comparables."

b. "West End Grand Bahama Island is the most ambitious of the five communities,
covering 1,957 acres along six miles of oceanfront on Grand Bahama Island.
Amenities will include two golf courses, a water park, a casino, and one of the
world's largest private marinas. The sale of 1,858 single-family lots and 4,396
condominium lots is expected to generate 41% of anticipated cash flow. Revenue
assumptions appear to be supported by 3,000 existing (but non-contractual)
reservations. However, escalating development costs could negatively affect
ultimate cash flow."

**C.    How did Defendants CSCF Borrowers Obtain the $675 Million CSCF?**

58. Credit Suisse prepared a Confidential Information Memorandum for prospective lenders under the CSCF that was based upon "information supplied by or on behalf of" Defendants CSCF Borrowers.

59. The Credit Suisse Confidential Information Memorandum set forth a "Property Overview" of the CSCF Developments that included the following description for GSM:

   a. 1,957 acres on 6 miles of ocean

   b. 1,858 single family lots

   c. 4,396 condominiums

   d. Homesite boat slips and marinas with mega-yacht capacity

   e. Two signature golf courses

   f. Multi-million dollar water park

   g. Spa, fitness center, tennis courts, biking trails

   h. 120,000 ft casino

60. The "Property Overview" in the Confidential Information Memorandum projected that Ginn would sell 397 lots in the Tesoro development in Florida by 2009, with only 11 lots under contract as of May 2006.

61. In fact, the developer of Tesoro (owned by Defendants ERG 20% and Lubert-Adler 80%) held an extravagant "launch" event at Tesoro in October 2005, during which it obtained sales reservations or contracts for nearly all of the approximately 450 residential lots that were offered. However, following Hurricane Wilma in late October 2005, the vast majority of the Tesoro contracts and sales reservations were cancelled or failed to close.

62.  The "Property Overview" in the Confidential Information Memorandum projected that Ginn would sell 290 lots in the Quail West development in Florida by 2008, with only 25 lots under contract as of May 2006.

63.  In fact, the developer of Quail West (owned by Defendants ERG 20% and Lubert-Adler 80%) held an extravagant "launch" event at Quail West in December 2005, during which it obtained sales reservations or contracts for nearly all of the approximately 450 residential lots that were offered.  However, following Hurricane Wilma in late October 2005, the vast majority of the Quail West contracts and sales reservations were also cancelled or failed to close.

64.  The "Property Overview" in the Confidential Information Memorandum projected that Ginn would sell 453 lots in the Hammock Beach River Club development in Florida by 2008, with no lots under contract as of May 2006.

65.  The "Property Overview" in the Confidential Information Memorandum projected that Ginn would sell 1,500 lots in the Laurelmor development in North Carolina by 2010, with no lots under contract as of May 2006.

66.  The "Property Overview" in the Confidential Information Memorandum projected that Ginn would sell 1,858 lots in the GSM development by 2010, with no lots under contract as of May 2006.

67.  The Confidential Information Memorandum stated that as of May 2006, "Total Expenditures" of $69.4 million had been invested in the development of GSM.

68.  In connection with securing the CSCF, Defendants CSCF Borrowers and Lubert-Adler provided Credit Suisse with Project Projections of cash flow from estimated future lot sales in each of the five CSCF Developments ("CSCF Project Projections").

69.   Defendants CSCF Borrowers and Lubert-Adler also provided the CSCF Project Projections to Cushman & Wakefield, which had been designated as the "appraiser" for the CSCF.

70.   Cushman & Wakefield used the CSCF Project Projections to determine the "Total Net Value" ("TNV") of the CSCF Developments.  The amount of the Total Net Value assigned to the CSCF Developments was critical to the determination of the total amount that could be borrowed under the CSCF.  The higher the TNV assigned to the CSCF Developments, the higher the amount that could be borrowed under the CSCF.

71.   Although the CSCF credit agreements refer to Cushman & Wakefield as the "Appraiser" for the CSCF Developments and refer to the Total Net Value valuation as a "Qualified Appraisal," the Total Net Value valuation was not an appraisal in any sense of the word.

72.   Cushman & Wakefield was initially retained by Credit Suisse to provide a Total Net Value "appraisal" in connection with the Yellowstone Credit Suisse loan.  According to testimony in the Yellowstone Bankruptcy proceeding Credit Suisse engaged Dean Paauw of GSM to provide the Total Net Value "appraisal" of the Yellowstone property.

73.   Paauw testified in the Yellowstone Bankruptcy proceeding that prior to being contacted by Credit Suisse, he had never done or heard of a Total Net Value "appraisal" despite having done approximately 400-500 appraisals in his professional career.

74.   Paauw testified in the Yellowstone Bankruptcy proceeding that he did not know where the definition for Total Net Value had come from and that the TNV "appraisal" did not comply with the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") because it was not an "As Is" or "Market Value" appraisal.  In practice, a

Total Net Value valuation is a discounted cash flow analysis that does not apply a discount rate for revenue expected in the future.

75.  The Cushman & Wakefield appraisals defined the "Total Net Value" of each CSCF Development as "the sum of the market value of the bulk lots of the entire planned community, as if all of the bulk lots were complete . . . and available for sale to merchant builders, as of the date of the appraisal," without deduction or discounting for pertinent risk factors or the time value of money.

76.  The Total Net Value methodology was designed to generate a value that significantly exceeded the actual as-is fair market value of the property interests being valued.  In this way, the Total Net Value methodology allowed the CSCF to have a much lower "loan to value" ratio than would otherwise have been possible using a traditional market valuation of the proposed collateral.

77.  By virtue of the Total Net Value methodology the CSCF did not comply with U.S. banking laws, such as the Financial Institutions Recovery Reform Act of 1989 ("FIRREA"), which provides that, before a regulated financial institution may make or invest in a loan secured by real estate, the loan must be supported by an appraisal reflecting a traditional market valuation of the proposed collateral.

78.  To circumvent this requirement, Credit Suisse coordinated the CSCF through its "Cayman Islands Branch," an off-shore "affiliate" with no physical presence in the Cayman Islands, and syndicated the loan produce to non-regulated entities, such as hedge funds.

79.  Defendants Lubert-Adler, Lubert-Adler Funds III and IV, and ERG Enterprises knew that the use of the Total Net Value method to "appraise" the CSCF Developments

resulted in "appraisals" for each of those developments that significantly exceeded the actual as-is fair market value of the property interests being valued and were vastly overstated.

80. In fact, after the closing of the CSCF, Bobby Ginn reportedly boated that it was "the best sales job of [his] life."

81. For example, whereas the St. Lucie County Property Appraiser assessed the value of all Tesoro real and tangible property in 2006 at $74,910,626, the Total Net Value "appraisal" for the CSCF of the unsold Tesoro lots as of April 14, 2006 was set at $210 million.

82. For example, although Ginn and Defendant Lubert-Adler missed their original projections for the Tesoro 2005 launch by a huge margin (projecting 421 lot closing by January 31, 2006 but closing 40 or less), the Project Projections supplied by Defendants CSCF Borrowers and Lubert-Adler for Tesoro forecasted 74 additional lot and condominium closings during the second half of 2006, with 290 more by the end of 2008. In actuality, there were fewer than 40 additional lot closings (and no condominium closings) in Tesoro through the end of 2008.

83. For example, even though the GSM Land was purchased in August 2005 for $24.5 million, the Total Net Value "appraisal" for GSM set its value at $618 million as of June 8, 2006, only ten months later.

84. The cash flow Project Projections that Defendants CSCF Borrowers provided to Cushman & Wakefield in support of the Total Net Value "appraisal" for GSM were speculative, unreasonable and unsupported by historical information. In addition the Project Projections incorporated the assumption that all marketed amenities for GSM (not

18

just the contractually-required infrastructure) would be developed. At the time of the GSM Project Projections:

    a.  The GSM Land was undeveloped;

    b.  The initial developer of GSM had not yet secured approval from HUD to market GSM lots in the United States;

    c.  There was no history of GSM lot sales supporting the lot sales prices set forth in the Project Projections;

    d.  There were no lot appraisals supporting the lot sales prices set forth in the Project Projections; and

    e.  There were purportedly 3,000 GSM lot reservations and 158 powers of attorney for GSM lot purchases, but no contracts for the purchase of GSM lots and no history of lot sales.

85. In an effort to boost the Total Net Value for GSM, Defendants CSCF Borrowers and Lubert-Adler dramatically increased the projected number of lot sales from the numbers that were originally set forth in the December 9, 2005 Heads of Agreement with the Bahamian government. Notwithstanding the fact that the original Heads of Agreement only contemplated 870 residential lots, the March 31, 2006 Project Projections more than doubled the projections for residential lots to 1,858.

86. Based on the average price per lot as set forth in the Project Projections, the sudden increase in projected lot sales from 870 to 1,858 boosted the projected future Total Lot Sales from $636 million to more than $1.36 billion.

87. Not coincidentally, GSM's initial developer on June 8, 2006 (the date of the CSCF closing) entered into an amendment to the Heads of Agreement to increase the

number of residential lots from 870 to 1,890 and to increase the number of condominium units from 4,400 to 4,900.

88.   The Total Net Value for all five CSCF Developments was set at approximately $1.5 billion.  The Total Net Value for GSM accounted for 41% of this overall amount.

89.   The Total Net Value "appraisals" were used to inflate the size of the CSCF to $675 million.  Without the use of the overstated Total Net Value "appraisal," Defendants CSCF Borrowers would not have been able to secure the $675 million CSCF.

90.   Because it was based on Total Net Value "appraisals" of the CSCF Developments, the size of the $675 million CSCF was not reasonable in comparison to the value of the collateral represented by the CSCF Developments.

91.   Because it was based on Total Net Value "appraisals" of the CSCF Developments, the CSCF was based on estimates of the future value of the CSCF Developments and utilized that speculative future value to create a current debt service obligation in the amount of $675 million.

92.   Because it was based on Total Net Value "appraisals" of the CSCF Developments, the $675 million CSCF carried an excessive risk of failure.

93.   Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises knew the facts set forth in Paragraphs 44-92, above, but fraudulently concealed those facts from prospective purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van.

**D.    How Were Defendants CSCF Borrowers Planning to Repay the $675 Million CSCF?**

94.   In order to enter into the CSCF, it was necessary for Defendants Lubert-Adler, ERG Enterprises and CSCF Borrowers to allocate the future cash flow from lot sales in GSM (as well as the other CSCF Developments) to meet the repayment obligations under the CSCF, instead of allocating the cash flow from lot sales in the CSCF Developments to the benefit of each development as an independently capitalized development subject to its own market conditions.

95.   The ability of Defendants CSCF Borrowers to service the debt under the $675 million CSCF was dependent upon cash flow from future "projected" lot sales in each of the five CSCF Developments in the following percentages:

   a.   Tesoro: 14%

   b.   Quail West: 10%

   c.   Hammock Beach: 6%

   d.   Laurelmor: 29%

   e.   GSM Subdivision: 41%

96.   The Projections called for 59% of the cash flow for CSCF repayment to come from future lot sales in four CSCF Developments in Florida and North Carolina ("United States CSCF Developments").

97.   The amortization on the Credit Suisse Credit Facility was accelerated, requiring that balances be repaid using 100% of excess cash flow until one-half of the first-lien balance was repaid.  Thereafter, 50% of excess cash flow was required to be applied to the outstanding balances.

98. Thus, under the terms of the CSCF, 100% of excess cash flow from the sale of every lot in the CSCF Developments was funneled to Credit Suisse in service of the CSCF debt obligation.

99. Under the terms of the CSCF, if the U.S. CSCF Developments did not meet their respective lot sales projections, Defendant Ginn-LA West End LLLP was required to loan the U.S. CSCF Developers the funds necessary to meet their payment obligations under the CSCF ("GSM Shortfall Obligations").

100. Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises knew the facts set forth in Paragraphs 94-99, above, but fraudulently concealed those facts from prospective purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van.

**E.    How Was the $675 Million CSCF Secured?**

101. The $675 million CSCF was collateralized across all five CSCF Developments: substantially all assets of Defendants CSCF Borrowers and each development, including all land and improvements, were pledged by Defendants Lubert-Adler, Lubert-Adler Funds III and IV, Ginn-LA CS Holding, ERG Enterprises and Ginn-LA West End LLLP to secure the CSCF.

102. Defendants Lubert-Adler, Lubert-Adler Funds III and IV, Ginn-LA CS Holding, ERG Enterprises and Ginn-LA West End LLLP also pledged as collateral under the CSCF their ownership interests in the developer companies for each CSCF Development, including all company assets and rights of control.

103. GSM, along with Defendants Ginn-LA West End LLLP and Ginn West End GP were responsible for the entire amount of the $675 million CSCF.

104.     First, the CSCF was secured by a $276 million mortgage on all 1,957 acres of the GSM Land.  More specifically, the CSCF was secured by a collateral assignment of an intra-company note and mortgage on the GSM Land given by initial GSM developer Ginn-LA West End Limited to Defendant Ginn-LA Conduit Lender.

105.     Second, Defendants Lubert-Adler and ERG Enterprises pledged their ownership interests in Defendants Ginn-LA West End LLLP and Ginn West End, which interests included all company assets, rights over the control of future development of GSM, "developer" status under the "Heads of Agreement" with the Bahamian government, control over the GSM Home Owners Association, control over the GSM CC&Rs (which run with the title to Plaintiffs' lots and govern Plaintiffs' rights and obligations in connection with the ownership of their lots), control over operation of GSM Club Operation, and control over the GSM Architectural Control Board.

106.     Defendant Ginn-LA West End LLLP (the ultimate parent company for the initial developer of GSM: Ginn-LA West End Limited), in turn, guaranteed the obligations under the $675 million CSCF by a pledge of 65% of its interests in Ginn-LA International Business Company, Ltd. (the immediate parent company for the initial developer of GSM: Ginn-LA West End Limited) and 100% of its interests as the sole owner of Defendant Ginn-LA Conduit Lender, including its management and control rights in both entities.

107.     Although Defendants Lubert-Adler, Lubert-Adler Fund IV and Defendant ERG Enterprises guaranteed the pledge of their interests in Defendant Ginn-LA West End LLLP and Ginn West End, those guarantees were non-recourse as to Defendants Lubert-Adler, Lubert-Adler Fund IV and ERG Enterprises.  Thus, even

though the GSM development was liable for the entire $675 million CSCF, Defendants Lubert-Adler, Lubert-Adler Fund IV and ERG Enterprises made sure they had no liability for the $675 million CSCF debt.

108.    Despite the fact that the GSM Land and ownership of Defendant Ginn-LA West End LLLP were pledged as security for the CSCF, the CSCF was not intended to – and did not – benefit GSM. In fact, the CSCF doomed the future development of GSM and exposed prospective purchasers, including Plaintiffs, to the certain risk of a CSCF default and foreclosure.

109.    Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises knew the facts set forth in Paragraphs 101-108, above, but fraudulently concealed those facts from prospective purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van.

**F.    What Happened to the $675 Million Borrowed Under the CSCF?**

110.    The terms of the CSCF provided that less than a quarter of the CSCF proceeds would be used for working capital or development purposes: only the $165 million synthetic revolving loan was to be maintained in a deposit account "to fund general company and working capital needs" and "to finance a portion of the development, construction and other costs associated with each Project."

111.    The remaining $510 in CSCF proceeds was required to be utilized to pay transaction costs, to replace existing third-party debt, and to make distributions to the equity owners of the Projects, i.e., insiders and affiliates of the Debtors and Other Project Entities.

112.     On the June 8, 2006 CSCF closing date, Defendants CSCF Borrowers sent "irrevocable" notices to Credit Suisse requesting disbursement of $510 million.

113.     The CSCF included terms governing the required use of its proceeds. Loan proceeds were to be applied "to make certain distributions to the holders of Capital Stock in the Borrower in the amount of $333,125,000." The holders of Capital Stock in Defendants CSCF Borrowers were Defendants Lubert-Adler Funds III and IV and ERG Enterprises.

114.     Defendants Lubert-Adler Funds III and IV took more than 80% of a $333 million distribution from the CSCF ("CSCF Distribution").

115.     Defendant ERG Enterprises took something less than 20% of the $333 million CSCF Distribution.

116.     CSCF loan proceeds were also applied "to repay the "Existing Indebtedness" of the CSCF Developments. Of roughly $158 million distributed to repay Existing Indebtedness, only about $12 million was applied to repay Existing Indebtedness for Defendant Ginn-LA West End LLLP.

117.     Prior to the CSCF, the only Existing Indebtedness of GSM was a mortgage on the GSM Land for $12 million. That mortgage note was paid off with CSCF proceeds, only to be replaced by a mortgage note of more than $276 million on the GSM Land and liability for the entire $675 million CSCF.

118.     Of the $510 million taken by Defendants CSCF Borrowers on the CSCF closing date, 64% went to "distributions" to Defendant Robert Ginn and Lubert-Adler; 29% went to existing indebtedness for Ginn developments other than GSM, 5% went to

transaction costs for the overall loan, and 2% went to Existing Indebtedness for Defendant Ginn-LA West End LLLP.

119.    Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises knew the facts set forth in Paragraphs 110-118, above, but fraudulently concealed those facts from prospective purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van.

**G.    What Happened to the $333 Million Distributed to Defendants Lubert-Adler and ERG Enterprises?**

120.    Defendants Lubert-Adler and ERG Enterprises have never revealed what became of the $333 million distribution they took from the $675 million CSCF.

121.    It was common knowledge among sales persons at GSM in the summer of 2006 that Bobby Ginn had taken out a large loan and used the money to purchase a NASCAR racing team.

122.    It was initially announced in 2006 that Ginn Clubs & Resorts had agreed to become the primary sponsor for MB2 Motorsports for a limited number of races in 2006.

123.    In July 2006, Bobby Ginn became the majority owner (80%) of MB2 Motorsports, which raced as the NASCAR Nextel Cup series team Ginn Racing.

124.    Bobby Ginn poured millions into the NASCAR team within a short period of time. He purchased a $2.5 million "7-post shaker," a piece of equipment for chassis building that only the wealthiest multi-car NASCAR teams actually owned instead of leasing. He expanded the two-car team to three, and he purchased at least two private jets for the team. Bobby Ginn spent tens of millions to upgrade the race team.

125.    Ultimately, Bobby Ginn's foray into NASCAR has been called the

quickest and most dramatic rise and fall of a race team in recent NASCAR history.  One

commentator in mid-2007 described Bobby Ginn's approach to NASCAR in terms that

could apply just as easily to his role in the GSM debacle:

> Since owner Bobby Ginn purchased the two-team organization formerly known as
> MB2 Motorsports from its previous majority owner Nelson Bowers barely a year
> ago, what the NSACAR community has witness is an illusion, a highly calculated
> gamble, based on maintaining an appearance of stability to gain acceptance within
> the sport in hopes of securing significant outside financing, money that was
> desperately needed to continue the charade.  And it was a fairly well orchestrated
> deception …one that almost worked.  The plan's down fall was simply that no
> corporate sponsor was ever found that would take the bait that Bobby Ginn set
> out, and the ruse has now begun to unravel.

## IV.    The $675 Million CSCF Prevented the Development of Amenities Planned and Marketed for GSM

126.    In a June 2005 letter written to the Bahamian government, a Bahamian

attorney for GSM, Terence Gape, describes Ginn Development Company's strategy for

marketing and developing residential resort communities:

> Ginn have been successful because before it develops a Project, it successfully
> markets and pre-sells at least 1/3 of the lot product to be built:  this guarantees the
> performance of the Company to complete the Project so that buyers can have
> complete confidence that what is in the "blurb" will be built.

127.    Mr. Gape's June 2005 letter states that pre-sales are essential to Ginn's

successful development of GSM:

> Ginn can only be successful if it can market the Project as it does in the United
> States and that is by pre-sales which in its first Launch guarantee (in addition to
> the Hartford Bond) the full performance by the Company.  This process of pre-
> sales in the past 10 years does attract investors who purchase lots and/or
> condominiums before construction and fully pay for them happy in the knowledge
> that within 1 year or 2 or 3 they can sell onward for a profit.

128.    The terms of the CSCF prevented the initial developer of GSM (Ginn-LA

West End Limited) from utilizing cash flow from "pre-sales" of GSM lots to "guarantee

the performance of [the initial developer] to complete the Project so that buyers can have complete confidence that what is in the 'blurb' will be built."

129.     From the June 8, 2006 CSCF closing date, GSM was bound to the success or failure of the United States CSCF Developments.

130.     Under the terms of the CSCF, if the United States CSCF Developments did not meet their respective lot sales projections, Defendant Ginn-LA West End LLLP was required to loan the United States CSCF Developers the funds necessary to meet their payment obligations under the CSCF ("GSM Shortfall Obligations").

131.     Under the terms of the CSCF, if the United States CSCF Developments failed to generate sufficient cash flow to meet the CSCF Borrowers' repayment obligations, the entire risk of default fell on GSM.

132.     In light of the terms of the CSCF, GSM lot owners, including Plaintiffs, bore the undisclosed risk that the United States CSCF Developments would fail to generate sufficient cash flow to meet the CSCF Borrowers' repayment obligations.

133.     In light of the terms of the CSCF, GSM lot owners, including Plaintiffs, were unknowingly investing in all five of the CSCF Developments.

134.     In light of the terms of the CSCF, GSM lot owners, including Plaintiffs, bore the undisclosed risk that GSM would be obligated for the entire $675 million credit facility in the event of a default by the CSCF Borrowers.

135.     The CSCF payment terms (requiring that 100% of cash flow from GSM lot sales to be used to service the CSCF debt) prevented the developer of GSM from generating sufficient cash flow to support development of the amenities that were planned and marketed for GSM.

136.    In light of the terms of the CSCF, the only source of funding for the development of the amenities that were planned and marketed for GSM was the CSCF proceeds.

137.    From the June 8, 2006 CSCF closing date, all current and future assets of GSM were pledged in exchange for: (1) the $333 million distribution to Defendants Lubert-Adler and ERG Enterprises; and (2) recapitalization of (primarily) the United States CSCF Developments.  Only $12 million of the $675 million CSCF was used for GSM existing debt.

138.    The terms of the CSCF prevented the CSCF Borrowers, or any of the CSCF Developments, from incurring any additional debt during the term of the CSCF. Because the CSCF leveraged GSM to the hilt, there was no remaining equity in GSM to support the development of the amenities that were planned and marketed for GSM.

139.    The terms of the CSCF therefore made the development of the amenities that were planned and marketed for GSM impossible.

140.    In light of the terms of the CSCF, GSM lot owners, including Plaintiffs, were unknowingly investing in a development that had been looted by Defendants Lubert-Adler and ERG Enterprises so that those defendants could take a $333 million distribution from the CSCF.

141.    If Defendants Lubert-Adler and ERG Enterprises had not facilitated the CSCF or if those defendants had not included GSM as part of the CSCF, GSM would have remained an independently capitalized development, responsible for its own debt and entitled to the use of its cash flow.

142.     If Defendants Lubert-Adler and ERG Enterprises had not facilitated the CSCF or if those defendants had not included GSM as part of the CSCF, the GSM lot sales from 2006 through 2008 (prior to the date when sales were prohibited by HUD) would have been sufficient to service the $12 million mortgage on the GSM Land, to fund the contractually-required infrastructure for GSM, and to begin development of the amenities that were planned and marketed for GSM.

143.     In a February 5, 2004 letter, the Bahamian attorney for GSM, Terence Gape, assured the Bahamian Minister of Financial Services and Investments that the GSM development was more secure because GSM would be owned 100% by Ginn, rather than by multiple developer parties: "This is all very good news and will allow Ginn to have one hundred percent ownership and control of the project with no potential internal conflicts for the future."

144.     In light of the terms of the CSCF, GSM lot owners, including Plaintiffs, bore the undisclosed risk that if the U.S. CSCF Developments did not generate sufficient cash flow to service the CSCF debt, Credit Suisse would foreclose on the GSM Land and on the ownership interests in Defendant Ginn-LA West End LLLP, including all company assets and the rights over the control of future development of GSM.

145.     In light of the terms of the CSCF, GSM lot owners, including Plaintiffs, bore the undisclosed risk that Ginn would no longer have "one hundred percent ownership and control of the project with no potential internal conflicts for the future."

## V.     Almost Immediately After Closing on The $675 Million CSCF, Bobby Ginn Was Concerned About Defaulting on the Loan

146.     Faced with the prospect of meeting the staggering GSM lot sales projections provided to Cushman & Wakefield in order to obtain the $675 million CSCF

("Projected GSM Lot Sales"), only days after closing on the $675 million CSCF and before Plaintiffs entered into their GSM lot purchase contracts, Bobby Ginn revealed his concern that Ginn would not meet the Projected GSM Lot Sales.

147.    Shortly after the June 8, 2006 CSCF closing, there was disagreement within the Ginn organization about how to close GSM lot sales at a sufficient rate to meet the Projected GSM Lot Sales. A June 16, 2006 email from John Gantt, the head of sales for Ginn Development, reported:

> I just had the pleasure of speaking to Bobby. He asked what we are doing sales wise at Versailles at the moment. I told him that we are getting ready to bring some of the back lots on the market, exactly what I thought we all talked about in Greenville. He told me in no uncertain terms that he had instructed us to sell 110 more Ocean lots and he said he wanted it done in the next 60 days. He also said not to sell back lots until those 110 were sold. He jumped my ass over and over. Please let me know your thoughts ASAP.

148.    In a June 19, 2006 email, Myles Newell wrote to John Gantt and others, disagreeing with the suggestion from "Bobby" that the sales team only sell Ocean lots instead of other GSM lots. He indicated that the sales team would attempt to sell Ocean lots, but that they should also attempt to close sales on other GSM lots with reservation holders who would be more likely to buy the other lots (which were being offered at lower prices). He concludes:

> In summation – We have lots available for sale, we have people that want to buy them, we need to generate a large amount of revenue in a very short period of time – I do not know why we would not stay on this plan. It will not take away from trying to sell as many oceanfronts as possible. However, if we do not release any other inventory and put all our eggs in the oceanfront lots we have not fall back plan and our chance for failure rises drastically in my opinion. John, please go over this with Bobby or set up a time for all of us to go over it with him or simply forward him my email. I will do whatever I can to keep us on this path.

## VI.    Fraudulent Concealment of the Existence and Terms of the $675 CSCF ("Initial CSCF Fraud")

31

149.     In order to make sufficient lot sales in GSM (as well as the other CSCF Developments) to meet the repayment obligations under the $675 million CSCF, it was essential for Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises to conceal the existence and terms of the CSCF from prospective purchasers in GSM (as well as from prospective purchasers in the other CSCF Developments).

150.     Because the CSCF was a new loan product with extraordinarily unique terms, prospective purchasers in GSM, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van, had no reason to expect that GSM was part of a $675 million credit facility that was cross-collateralized over five different Ginn-LA developments, out of which Defendants Lubert-Adler and ERG Enterprises had taken a $333 million distribution.

151.     Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises fraudulently concealed from prospective GSM purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van, the massive amount of the $675 million CSCF.

152.     Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises knew that if prospective GSM purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van, were informed about the massive amount of the $675 million CSCF, those prospective purchasers would have inquired further into the terms of the CSCF.

153.    Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises fraudulently concealed from prospective GSM purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van, the existence and amount of the CSCF Distribution.

154.    Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises knew that if prospective GSM purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van, were informed about the existence and amount of the CSCF Distribution, those prospective purchasers would not have purchased GSM lots.

155.    Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises fraudulently concealed from prospective GSM purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van, the pledge of all ownership interests in Defendant Ginn-LA West End LLLP to Credit Suisse as collateral for the CSCF ("Pledge of GSM Interests").

156.    Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises knew that if prospective GSM purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van, were informed about the Pledge of GSM Interests, those prospective purchasers would not have purchased GSM lots.

157.    Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises fraudulently concealed from prospective GSM purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van, the pledge of their ownership interests in the GSM Land to Credit Suisse as collateral for the CSCF ("Pledge of GSM Land").

158.    Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises fraudulently concealed from prospective GSM purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van, the fact that that the CSCF was partially secured by a $277 million mortgage on the GSM Land.

159.    Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises knew that if prospective GSM purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van, were informed that the CSCF was partially secured by a $277 million mortgage on the GSM Land, those prospective purchasers would not have purchased GSM lots.

160.    Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises fraudulently concealed from prospective GSM purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van, the fact that CSCF loan proceeds were applied "to repay the "Existing Indebtedness" of the five CSCF Developments.

161.    Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises knew that if prospective GSM purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van, were informed that the terms of the CSCF provided funding for five Ginn developments, not just GSM, those prospective purchasers would not have purchased GSM lots.

162.    Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises fraudulently concealed from prospective GSM purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van, the fact that only 2% of the Initial CSCF Disbursement went to existing indebtedness for GSM, while 64% went to the CSCF Distribution; 29% went to existing indebtedness for four Ginn developments other than GSM, and 5% went to transaction costs for the CSCF.

163.    Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises knew that if prospective GSM purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van, were informed about how much of the CSCF went to GSM, those prospective purchasers would not have purchased GSM lots.

164.    Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises fraudulently concealed from prospective GSM purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van, the facts that the

$675 million CSCF was to be repaid from cash flow generated by the future "projected" lot sales in all five CSCF Developments and that 58% of the cash flow for CSCF repayment to come from future lot sales in the U.S. CSCF Developments.

165.    Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises knew that if prospective GSM purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van, were informed that that the $675 million CSCF was to be repaid from cash flow generated by the future "projected" lot sales in all five CSCF Developments or that 58% of the cash flow for CSCF repayment to come from future lot sales in the U.S. CSCF Developments, those prospective purchasers would not have purchased GSM lots.

166.    Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises fraudulently concealed from prospective GSM purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van, the GSM Shortfall Obligations.

167.    Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises knew that if prospective GSM purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van, were informed about the GSM Shortfall Obligations, those prospective purchasers would not have purchased GSM lots.

168.    Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises

36

fraudulently concealed from prospective GSM purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van, the GSM Repayment Obligations.

169.     Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises knew that if prospective GSM purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van, were informed about the GSM Repayment Obligations, those prospective purchasers would not have purchased GSM lots.

170.     Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises fraudulently concealed the GSM Repayment Obligations from prospective GSM purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van.

171.     Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises knew that if prospective GSM purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van, were informed that the terms of the CSCF precluded any future debt on GSM assets or by Defendant Ginn-LA West End LLLP, those prospective purchasers would not have purchased GSM lots.

172.     Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises fraudulently concealed the fact that that the terms of the CSCF precluded any future debt

on GSM assets or by Defendant Ginn-LA West End LLLP from prospective GSM

purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford

Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group,

Kherkher, Lammertse, and Van.

**VII.    Fraudulent Concealment Concerning the 2007 Default and CSCF
Restructure ("2007 CSCF Default Fraud")**

173.    In the first quarter of 2007, three months after closing on the first GSM lot

sales, Defendants CSCF Borrowers defaulted on the CSCF ("2007 Initial CSCF

Default").

174.    The 2007 Initial CSCF Default was not due to the underperformance of lot

sales in GSM.  The initial GSM developer (Ginn-LA West End Limited) closed 194 lot

sales through 2007.

175.    The 2007 Initial CSCF Default was instead due to the underperformance

of sales in other CSCF developments and particularly the Florida CSCF developments,

which created a cash flow deficit that impaired the ability of the CSCF Borrowers to meet

the payment obligations under the CSCF.

176.    In a March 27, 2007 publication entitled, "Ginn-LA Ratings on Watch

Neg; Exposure to Florida's Soft Resort Real Estate Market Cited," Standard & Poor's

reported on the status of the CSCF Borrowers' ability to meet repayment obligations

under the $675 Million CSCF.

177.    The March 27, 2007 Standard & Poor's Report stated that Standard &

Poor's Rating Services placed its ratings of the CSCF Borrowers on "Credit Watch with

negative implications," explaining, "[o]f particular concern is the borrowers'

concentration in oversupplied Florida housing markets."

178.    In a May 1, 2007 publication entitled, "Ginn-LA Ratings Lowered on Weak Sales and Diminished Recovery Prospects; Still on Watch Neg," Standard & Poor's again reported on the status of the CSCF Borrowers' ability to meet repayment obligations under the $675 Million CSCF.

179.    The May 1, 2007 Standard & Poor's Report explained that the ratings downgrades reflected a cash flow deficit resulting from weakened sales: "Over the past several months, sales trends have weakened materially while contract cancellations have increased well above historical levels."

180.    The May 1, 2007 Standard & Poor's Report described the desperate situation facing the CSCF Borrowers:

> Financial flexibility has been curtailed by a 61% drop in revenue (relative to original projections) that contributed to a $61 million cash flow shortfall through the first quarter of 2007, which the borrowers covered using the revolver. While the borrowers are currently in compliance with financial covenants governing the credit facilities, the sharp housing corrections makes it likely that leverage thresholds will be breached. Liquidity is further constrained by a 60-day moratorium on credit facility borrowings imposed by creditors after the borrowers were delayed in providing 2006 audited financial statements. The borrowers intend to deliver delinquent documents, negotiate covenant relief and credit agreement amendments, and finalize a restructuring plan over the next 60 days. As a consequence of the constrained liquidity, the borrowers will use existing cash balances, proceeds from anticipated closings, and a $20 million cash infusion from their sponsors to fund immediate working capital needs.

181.    In addition, the May 1, 2007 Standard & Poor's Report revealed that the development of the contractually-required infrastructure for GSM had not yet been funded and would require an additional infusion of capital from Defendants Lubert-Adler and ERG Enterprises:

> In the longer term, the borrowers will rely on a significant additional equity investment from their sponsors ($160 million) that will be used for new development vehicles that will take on some of the infrastructure and amenity construction costs that would have previously been borne by the borrowers. However, the borrowers will need restored access to the credit facility in order to

fund the considerable infrastructure improvements necessary to realize the full value of the communities.

182.    As a result of the CSCF Initial Default, in the first quarter of 2007, Defendants CSCF Borrowers, Lubert-Adler, Lubert-Adler Fund IV and Lubert-Adler Fund V and Ginn-LA OBB entered into agreements to restructure the CSCF in order to avoid foreclosure ("2007 CSCF Restructure").

183.    The GSM resort core land included the land on which the proposed GSM casino, condominium tower and hotel, shops and restaurants, mega-yacht marina and golf club were to be constructed (collectively "GSM Resort Core").

184.    In connection with the 2007 CSCF Restructure, the initial GSM developer (Ginn-LA West End Limited) sold the GSM Resort Core to Defendant Ginn-LA OBB.

185.    In connection with the 2007 CSCF Restructure, the initial developer of GSM (Ginn-LA West End Limited) on July 20, 2007 entered into an Assignment Regarding Heads of Agreement with Defendant Ginn-LA OBB that made an exclusive assignment to Defendant Ginn-LA OBB, *inter alia*, of all the rights set forth in the Head of Agreement relating to the gaming license for the GSM casino.

186.    In connection with the 2007 CSCF Restructure, the Board of Directors for the initial developer of GSM (Ginn-LA West End Limited) executed a Written Consent ("GLA BOD Written Consent") on July 20, 2007.  Dean Adler signed the GLA BOD Written Consent.

187.    The GLA BOD Written Consent acknowledged that GSM had been encumbered with a mortgage as security for the $675 million CSCF and that Defendants CSCF Borrowers had defaulted under the CSCF.

188.      The GLA BOD Written Consent acknowledged that as part of the 2007

CSCF Restructure, GSM initial developer Ginn-LA West End Limited was selling the

GSM Resort Core to Defendant Ginn-LA OBB.

189.      Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG Enterprises

concealed the existence of the 2007 Initial CSCF Default and the terms of the 2007 CSCF

Restructure from prospective purchasers in GSM and GSM lot owners, including

Plaintiffs.

190.      Defendants Ginn-LA West End LLLP, Lubert-Adler and Ginn-LA OBB

knew that if prospective GSM purchasers and GSM lot owners, including Plaintiffs, were

informed about the 2007 Initial CSCF Default or that the GSM Resort Core had been sold

to Defendant Ginn-LA OBB, several results would occur, including the following:

a.   At least some GSM lot owners, including Plaintiffs Bredahl, Bailey, Domnick,

Jackson Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson,

Cicolani Group, Kherkher, Lammertsee and Van, would have inquired further into

the existence and terms of the $675 million CSCF, the 2007 Initial CSCF Default

and the 2007 CSCF Restructure.

b.  At least some GSM lot owners, including Plaintiffs Bredahl, Bailey, Domnick,

Jackson Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson,

Cicolani Group, Kherkher, Lammertsee and Van, would have discontinued making

payments under GSM lot loans with Ginn Financial /Bahamas Sales.

c.  At least some GSM lot owners, including Plaintiffs Bredahl, Bailey, Domnick,

Jackson Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson,

Cicolani Group, Kherkher, Lammertsee and Van, would have considered taking

legal action as a result of the Initial CSCF Fraud.

    d. Prospective purchasers, including Plaintiffs Crawford Group, would not have

closed on their GSM lot purchases.

## VIII.  Fraudulent Concealment Concerning the 2008 Default and CSCF Restructure ("2008 CSCF Default Fraud")

191.      In a January 11, 2008 publication entitled, "Ginn-LA Corporate Credit and

Bank Loan Ratings Lowered and Off Watch; Outlook Negative," Standard & Poor's

reported on the status of the CSCF Borrowers' ability to meet repayment obligations

under the $675 Million CSCF.

192.      The January 11, 2008 Standard & Poor's Report stated, "The negative

outlook reflects longer-term uncertainty regarding the timing of a recovery in the

discretionary luxury resort and second-home housing niche, particularly in oversupplied

Florida housing markets."

193.      The January 11, 2008 Standard & Poor's Report described the precarious

situation that existed even after the 2007 CSCF Restructure:

> A successful restructuring, which included a capital infusion from Lubert-Adler affiliates and a waiver of financial covenants from creditors, should provide sufficient liquidity to continue the construction of critical infrastructure in Ginn-LA's communities in 2008. However, if sales are meaningfully below revised projections, Ginn-LA may not have sufficient funds to pay carrying costs including debt service obligations. Lubert-Adler funds provided $201 million of new capital by purchasing $95 million of real estate from Ginn-LA, assuming a $36 million obligation to construct a golf course at Ginn sur Mer in West End, Grand Bahama Island, and making a $70 million equity investment in Ginn-LA West End Ltd. LLLP. Furthermore, creditors have agreed to waive all financial covenants governing a $165 million first-lien synthetic revolver (as well as the first- and second-lien term loans) until March 31, 2009. However, Ginn-LA's ability to meet financial obligations in the longer term, including secured debt maturities in 2011 and 2012, is contingent on significant additional real estate sales.

194.    Notwithstanding the serious issues with cash flow and debt obligations, Bobby Ginn conducted a press tour in January 2008 to spread the word that GSM development was moving forward, that construction on 375 units was expected to begin in early summer of 2008, that construction on residential lots was expected to begin later in 2009, and that GSM would be "fully operational in our core facilities with our amenities" in five years.

195.    In a June 24, 2008 publication entitled, "Ginn-LA Credit Ratings Lowered to 'CC' On Near-Term Liquidity Pressure," Standard & Poor's again reported on the status of the CSCF Borrowers' ability to meet repayment obligations under the $675 Million CSCF.

196.    The June 24, 2008 Standard & Poor's Report explained the reasons for the ratings downgrade:

> The downgrades reflect our expectation that cash flow from operations will not be sufficient to meet Ginn-LA's near-term working capital needs and that it may not have adequate liquidity to make future debt service payments. Sales of residential lots in the borrowers' luxury resort and second-home communities have fallen well short of expectations due to the persistent dearth in demand for discretionary home purchases, particularly in the oversupplied Florida housing markets. Financial flexibility is further constrained because unrestricted cash balances are negligible and the borrowers' $165 million first-lien synthetic revolver is fully drawn. Given Ginn-LA's substantial funding needs, we believe that a restructuring is increasingly likely unless the borrowers can access external credit.

197.    On June 30, 2008, Defendants CSCF Borrowers again defaulted on the CSCF by, among other things, failing to make required payments of interest, principal, and other amounts due under the Loans ("Final CSCF Default").

198.    The Final CSCF Default was not due to the underperformance of sales in GSM. The initial GSM developer (Ginn-LA West End Limited) had its best sales month

in the development's history in January 2008, in what Vice President of GSM Sales, Greg Ulmer, characterized as a "buying frenzy."

199.     The Final CSCF Default was instead due to the underperformance of sales in other CSCF developments and particularly the Florida CSCF developments, which continued to create cash flow deficits that impaired the ability of the CSCF Borrowers to meet the payment obligations under the CSCF.

200.     A Spring 2008 edition of the *Ginn Sur Mer Living* publication included a front-page article entitled, "Full Speed Ahead for Ginn sur Mer," in which Bobby Ginn offered assurances that GSM was not subject to the real estate declines seen in the United States:  "Even though the housing and the debt markets in the U.S. and U.K. have slipped, there is still a huge demand for The Bahamas, and we feel like this project is just hitting the market that still wants oceanfront and all of the other services that come along with it."

201.     On July 1, 2008, Ginn President Robert Gidel issued a statement concerning the Final CSCF Default ("July 1, 2008 Gidel Statement").  The July 1, 2008 Gidel Statement described the CSCF as "a non-recourse $675 million credit facility."

202.     This representation was false and misleading. While the CSCF was non-recourse as to Defendants Lubert-Adler and ERG Enterprises, the CSCF was, in reality, full recourse because all of the GSM Land and the ownership rights in Defendant Ginn-LA West End LLLP were pledged as collateral for the entire $675 million CSCF.

203.     The July 1, 2008 Gidel Statement described the CSCF as involving only four Ginn developments: Tesoro, Quail West, Laurelmor and GSM.

204.    This representation was false.  The CSCF involved five Ginn developments, including one the Gidel Statement failed to acknowledge: the Hammock Beach River Club.

205.    The July 1, 2008 Gidel Statement reassured GSM lot owners, "Ginn-LA West End Limited previously set up accounts which contain the funds necessary to complete the infrastructure and the initial 18-hole golf course at Ginn sur Mer.  These funds are not subject to the credit facility and are unaffected by the current situation, which means there will be no disruption to the continued development of the Ginn sur Mer project or the operations and development of Old Bahama Bay."

206.    This representation was false and misleading.  Defendant Lubert-Adler took out lines of credit from Barclays Bank and JP Morgan Bank in June 2007 for the infrastructure and golf course development.

207.    The July 1, 2008 Gidel Statement also reassured GSM lot owners, "The properties that are owned by Ginn-LA OBB, including the resort core of the Ginn sur Mer project, are not subject to this or any other credit facility."

208.    This representation was false and misleading.  The CSCF initially included all of the GSM Land.  It was not until the 2007 CSCF Restructure following the 2007 CSCF Initial Default that the GSM initial developer (Ginn-LA West End Limited) sold the GSM Resort Core to Defendant Ginn-LA OBB.

209.    On August 6, 2008, Bobby Ginn appeared at a press conference to discuss the CSCF and the status of GSM development ("August 6, 2008 Bobby Ginn Statement").  The August 6, 2008 Bobby Ginn Statement was intended to reassure the

general public and GSM lot owners, including Plaintiffs, that the CSCF default would not impact the development of GSM.

210.    The August 6, 2008 Bobby Ginn Statement offered reassurances that, "Under the Credit Suisse loan, there were 868 lots. Two hundred of them have been sold and released, so they are in the hands of the independent owners that bought them. So the loan is only on the 668, and some undeveloped properties."

211.    This representation was false and misleading. The CSCF initially included all of the GSM Land. It was not until the 2007 CSCF Restructure following the 2007 CSCF Initial Default that the GSM initial developer (Ginn-LA West End Limited) sold the GSM Resort Core to Defendant Ginn-LA OBB.

212.    The August 6, 2008 Bobby Ginn Statement offered reassurances that "when we made that [CSCF] loan, one of the things we did is we took $124 million in cash and put it into a bankruptcy protected escrow account, for the sole purpose of finishing up development in those areas. We took $36 million, and we put it in escrow for the completion of the first golf course." The August 6, 2008 Bobby Ginn Statement offered additional reassurances that "we also wanted to be sure our property owners were protected, so for the people who bought the 200 lots, we put in cash, outside of the CS loan, funded by us, these escrow accounts to finish out that block of work."

213.    These representations were false and misleading. By stating that money was in escrow to "finish up development" rather than stating that money was in escrow for the completion of the contractually required infrastructure, Ginn implied that money had been set aside to complete development of the GSM marketed amenities. In addition,

Defendant Lubert-Adler took out lines of credit from Barclays Bank and JP Morgan Bank in June 2007 for the infrastructure and golf course development.

214.      The August 6, 2008 Bobby Ginn Statement offered reassurances that the GSM Resort Core was "[o]utside of that credit, completely unaffected by it."

215.      This representation was false and misleading.  The CSCF initially included all of the GSM Land.  It was not until the 2007 CSCF Restructure following the 2007 CSCF Initial Default that the GSM initial developer (Ginn-LA West End Limited) sold the GSM Resort Core to Defendant Ginn-LA OBB.

216.      The August 6, 2008 Bobby Ginn Statement offered reassurances that the CSCF was "a non-recourse loan."

217.      This representation was false and misleading.  While the CSCF was non-recourse as to Defendants Lubert-Adler and ERG Enterprises, the CSCF was, in reality, full recourse because all of the GSM Land and the ownership rights in Defendant Ginn-LA West End LLLP were pledged as collateral for the entire $675 million CSCF.

218.      The August 6, 2008 Bobby Ginn Statement offered reassurances that "If something goes wrong, and we're continuing to assume that it's not, all the money to develop all of the facilities is in place.  It's there now.  It's in an escrow account.  You can't get any safer than that."

219.      This representation was false and misleading.  By stating that money was in escrow "to develop all of the facilities" rather than stating that money was in escrow for the completion of the contractually required infrastructure, Ginn implied that money had been set aside to complete development of the GSM marketed amenities.

220.    The August 6, 2008 Bobby Ginn Statement offered reassurances that, "A hundred percent of the proceeds of the loan go to pay off Credit Suisse. So they are going to be fine. This loan is going to be fine."

221.    These representations were false and misleading because the terms of the CSCF, as outlined above, prevented the development of GSM to include the marketed amenities. In addition, a final default under the CSCF had occurred on June 30, 2008.

222.    The August 6, 2008 Bobby Ginn Statement offered reassurances that because the GSM Resort Core was outside of the CSCF, "regardless of what happens in the economy, the Grand Bahama Project is not in danger."

223.    This representation was false and misleading because the terms of the CSCF, as outlined above, prevented the development of GSM to include the marketed amenities. In addition, a final default under the CSCF had occurred on June 30, 2008.

224.    The August 6, 2008 Bobby Ginn Statement offered reassurances that, "We never want to say something that we can't back up and we never want to sell someone something that we can't back up. We're out of business if we ever do that."

225.    This representation was false and misleading because the terms of the CSCF, as outlined above, prevented the development of GSM to include the marketed amenities. In addition, a final default under the CSCF had occurred on June 30, 2008.

226.    As a result of the Final CSCF Default, HUD issued a directive in September 2008 "that it would administratively undertake" a suspension of the ILSA registrations filed for GSM and other CSCF Developments unless Ginn voluntarily suspended those registrations ("HUD Suspension").

227.     Ginn's lawyer filed the voluntary suspensions on September 10, 2008 for four of the CSCF Developments, including GSM, noting in an ensuing letter that the suspensions "were requested due to a default under certain credit facilities for which Credit Suisse was the agent."

228.     In October 2008, Credit Suisse notified the CS Borrower that the HUD suspension was, itself, a default under the CSCF.  In addition, Credit Suisse took the position that, "[t]he Borrower's suspension of the HUD Registrations and the resulting legal prohibitions on the sale of any Residential Lots resulted in a Material Adverse Effect" causing a default under the CSCF.

229.     Following the HUD Suspension, lot sales in GSM were legally prohibited for approximately two years.

230.     On December 19, 2008, Defendants CSCF Borrowers, Ginn-LA West End LLLP, Ginn-LA OBB, Ginn West End, ERG Enterprises, Lubert-Adler and Lubert-Adler Funds III, IV and V entered into agreements to again restructure development following the CSCF Final Default ("2008 Master Restructure").

231.     In connection with the 2008 Master Restructure, Defendants Ginn West End, ERG Enterprises, Lubert-Adler and Lubert-Adler Fund IV (collectively "West End Pledgors") agreed that the CSCF was in final default, that the CSCF lenders would foreclose on the Pledge of GSM Interests and the Pledge of GSM Land (collectively "West End Entity Interests"), and that the West End Pledgors had no defense to the foreclosure.

232.     As a result of the Final CSCF Default, two of the United States CSCF Developments (Tesoro and Quail West), filed Chapter 7 bankruptcy proceedings on December 23, 2008.

233.     As a result of the Final CSCF Default, Ginn sold its interests in another United States CSCF Development:  Laurelmor.

234.     Defendants Ginn-LA West End LLLP, Lubert-Adler, ERG Enterprises and Ginn-LA OBB concealed the existence and terms of the 2008 Master Restructure from GSM lot owners, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van.

235.     Defendants Ginn-LA West End LLLP, Lubert-Adler and Ginn-LA OBB fraudulently concealed the HUD Suspension from GSM lot owners, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van.

236.     Defendants Ginn-LA West End LLLP, Lubert-Adler and Ginn-LA OBB knew that if GSM purchasers, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van, were informed about the Final CSCF Default, the HUD Suspension, the existence and terms of the 2008 Master Restructure or the agreement of the West End Pledgors that they had no defense to a foreclosure on the West End Entity Interests, several results would occur, including the following:

   a.   At least some GSM lot owners would have inquired further into the terms of the CSCF and the restructuring following both the Initial and the Final CSCF

Defaults.

b.  At least some GSM lot owners would have considered discontinued payments under GSM lot loans with Ginn Financial /Bahamas Sales.

c.  At least some GSM lot owners would have considered taking legal action as a result of the Initial CSCF Fraud and the 2007 CSCF Default Fraud.

## IX.  Fraudulent Concealment Concerning the GSM Foreclosure ("GSM Foreclosure Fraud")

237.    As a result of the Final CSCF Default, on May 22, 2009, Credit Suisse filed an action in the Supreme Court of the State of New York to foreclose on the CSCF Pledge of GSM ("GSM Foreclosure").

238.    In the GSM Foreclosure, Credit Suisse stated that the West End Entity Interests consisted primarily of ownership interests in Defendant Ginn-LA West End LLLP (the ultimate parent company of the initial developer of GSM: Ginn-LA West End Limited) and associated rights in the property, profits and distributions of that entity.

239.    On December 23, 2009, an Order and Judgment of Foreclosure and Sale was entered in the GSM Foreclosure ("GSM Foreclosure Judgment"), which set forth an agreed Aggregate Indebtedness in the amount of $ 495,095,611.77.

240.    The GSM Foreclosure Judgment foreclosed Defendants Ginn West End, ERG Enterprises, CSCF Borrowers, Lubert-Adler, Ginn-LA CS Holding and others from any rights in the West End Entity Interests and provided that such interests be sold at public auction.

241.    Credit Suisse is taking steps to obtain the required Bahamian permits to purchase the West End Entity Interests at the public auction mandated by the GSM Foreclosure Judgment.

242.    Defendants Ginn-LA West End LLLP, Lubert-Adler, ERG Enterprises and Ginn-LA OBB fraudulently concealed the GSM Foreclosure from GSM lot owners, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van.

243.    Defendants Ginn-LA West End LLLP, Lubert-Adler, ERG Enterprises and Ginn-LA OBB fraudulently concealed from GSM lot owners, including Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef, Beachfront, Liles, Webb, Andrews, Josephson, Cicolani Group, Kherkher, Lammertse, and Van, the actual and potential consequences of the GSM Foreclosure on the future development of GSM.  This fraudulent concealment continues to the present date.

244.    Defendants Ginn-LA West End LLLP, Lubert-Adler, ERG Enterprises and Ginn-LA OBB have continued the Initial CSCS Fraud, the 2007 CSCF Default Fraud, the 2008 CSCF Default Fraud and the CSCF Foreclosure Fraud (collectively "CSCF Fraud") to the present and the CSCF Fraud is likely to continue in the future.

## X.    If Plaintiffs Had Known About the $675 Million CSCF, They Would Not Have Purchased GSM Lots

245.    The initial developer of GSM (Ginn-LA West End Limited) was a subsidiary of The Ginn Companies, LLC ("Ginn"), which specializes in resort development.  From its inception in 1998, Ginn established a reputation for developing successful private club and resort communities, which are differentiated from other properties by their amenities.

246.    The marketing materials for GSM described it as "a $4.9 billion world-class resort community" that would include the following components: 4,400

condominium and hotel units, centered around a 20-story "grand palace"; 1,800 single

family residential homesites; two signature golf courses created by Jack Nicklaus and

Arnold Palmer, with two clubhouses; a "mega-yacht marina"; a "Monte Carlo-style

casino" that would be "the premier casino in the islands"; water and swim pavilions; a

beach club; a world-class salon and spa; nightclubs and restaurants; "world-class

shopping"; a "grand canal" connecting all resort areas; gardens, fountains and pools.

247.    The marketing materials for GSM marketed GSM as a "lifestyle" that

could only have been envisioned and executed by Ginn:

> What we're creating at Ginn sur Mer in The Bahamas goes beyond that of the
> Grand Canal, Signature Golf Experience and even the Palace itself. What we're
> creating is an experience . . . A lifestyle that incorporates the sea, the setting, the
> architecture, the amenities, the community design, the abundance of activities and
> most of all the service."

248.    The marketing materials for GSM included assurances from Bobby Ginn:

> It's been a few years since we first announced plans for a new Club & Resort on
> Grand Bahama Island. Since then, we've envisioned and re-envisioned. We've
> worked very closely with the Bahamian government to develop an agreement that
> would benefit all those involved. The goal throughout it all was to perfect the
> conditions that would allow us to envision, develop and operate the largest and
> finest resort destination in the islands. It wasn't easy – if it was, anyone could do
> it – but we got there. This vision will have a major impact on The Bahamas and
> all of the Caribbean. The fact is, we would not have compromised the integrity of
> our vision, nor would we have shared any plans that we weren't 100% certain we
> could both develop and operate to the level you've come to expect from the Ginn
> Clubs & Resorts team. After reaching an agreement with the Bahamian
> government, we have perfected a destination of such grand pageantry and
> breathtaking awe, that we were compelled to name it for arguable the greatest
> palace ever conceived and realized…the Palace at Versailles.

249.    The marketing materials for GSM included assurances from Bobby Ginn

that "Ginn sur Mer promises to offer a recreational lifestyle unparalleled by any other

resort in the Caribbean and beyond."

250.    The initial developer of GSM was only contractually obligated to build the infrastructure (roads, sewer, power, water). Therefore, it was absolutely critical for prospective purchasers to evaluate the ability of the developer to deliver on the amenities described in the GSM marketing materials, which the initial GSM developer was not contractually obligated to build ("GSM Marketed Amenities").

251.    In order to evaluate the ability of the initial GSM developer to deliver on the GSM Marketed Amenities, it was essential that prospective purchasers be informed of any circumstances that might call into doubt Bobby Ginn's assurance that Ginn was "100% certain" it could develop and operate everything that was marketed.

252.    In order to evaluate the ability of the initial GSM developer to deliver on the GSM Marketed Amenities, it was essential that prospective purchasers be informed of any circumstances that might affect the timing of the development of GSM, including the GSM Marketed Amenities.

253.    In order to evaluate the ability of the initial GSM developer to deliver on the GSM Marketed Amenities, it was essential that prospective purchasers be informed of any circumstances that might interfere with the initial developer's control over the development and operation of GSM, including the GSM Marketed Amenities.

254.    In order to evaluate the ability of the initial GSM developer to deliver on the GSM Marketed Amenities, it was essential that prospective purchasers be informed of any circumstances that might interfere with the initial developer's ownership of the GSM Land.

255.    In order to evaluate the ability of the initial GSM developer to deliver on the GSM Marketed Amenities as well as facts that might interfere with Plaintiffs' future

use and enjoyment of their lots, it was essential that prospective purchasers be informed of any circumstances that might result in a transfer of the ownership in the initial GSM developer company.

256.     If prospective purchasers, including Plaintiffs, had been informed about the existence and terms of the CSCF, as outlined above, they would not have agreed to purchase GSM lots.

## XI.    Plaintiffs Were Immediately Damaged by the CSCF Fraud When They Closed on Their GSM Lot Purchases

257.     Plaintiffs did not discover the Credit Suisse Fraud, or that Defendants Lubert-Adler and ERG Enterprises had fraudulently concealed that scheme, until on or after July 2008 when Ginn President Robert Gidel announced the CSCF default and August 6, 2008 when Bobby Ginn announced the June 30, 2008 CSCF Final Default in a video press conference.

258.     The existence of the $675 million CSCF, and the risks it posed to the development, use and control of GSM, were material to Plaintiffs' decision whether to purchase GSM lots.

259.     Defendants Lubert-Adler, Ginn-LA OBB and ERG Enterprises received a direct benefit from the Credit Suisse Fraud.

260.     The Credit Suisse Fraud damaged Plaintiffs because the terms of the CSCF made it impossible for Plaintiffs to receive the benefits of the amenities that were marketed for GSM. But for the Credit Suisse Fraud, Plaintiffs would not have suffered these damages.

261.     The Credit Suisse Fraud damaged Plaintiffs because at the moment Plaintiffs closed on their GSM lot purchases, Plaintiffs had unwittingly invested in a

development that was liable for a $675 million loan that was used to fund the development of other Ginn Communities owned by purportedly independent Ginn Project Partnerships.  But for the Credit Suisse Fraud, Plaintiffs would not have suffered these damages.

262.    The Credit Suisse Fraud damaged Plaintiffs because at the moment Plaintiffs closed on their GSM lot purchases, Plaintiffs had unwittingly invested in a development that was liable for a $675 million loan that was used to provide a $333 million distribution to Defendants Lubert-Adler and ERG Enterprises.  But for the Credit Suisse Fraud, Plaintiffs would not have suffered these damages.

263.    The Credit Suisse Fraud damaged Plaintiffs because at the moment Plaintiffs closed on their GSM lot purchases, Plaintiffs had unwittingly invested in a development that was liable for a $675 million loan that could go into default and foreclosure if the sales in four other Ginn United States developments did not meet sales projections.  But for the Credit Suisse Fraud, Plaintiffs would not have suffered these damages.

264.    The Credit Suisse Fraud damaged Plaintiffs because at the moment Plaintiffs closed on their GSM lot purchases, Plaintiffs had unwittingly invested in a development where the ownership interests in the Project Partnership that owned the development had been pledged as collateral for a $675 million loan.  But for the Credit Suisse Fraud, Plaintiffs would not have suffered these damages.

265.    The Credit Suisse Fraud damaged Plaintiffs because at the moment Plaintiffs closed on their GSM lot purchases, Plaintiffs had unwittingly invested in a development where the land for the development was mortgaged for $276,750,000

million of the CSCF, even though GSM did not receive that amount from the CSCF. But for the Credit Suisse Fraud, Plaintiffs would not have suffered these damages.

266.     The Credit Suisse Fraud damaged Plaintiffs because at the moment Plaintiffs closed on their GSM lot purchases, Plaintiffs had unwittingly invested in lots that were (at the time of closing) worth far less than Plaintiffs paid for those lots. But for the Credit Suisse Fraud, Plaintiffs would not have suffered these damages.

267.     Plaintiffs were damaged in the amounts they have paid for their lots because they would not have closed on their GSM lot purchases if they had known about the Credit Suisse Fraud. But for the Credit Suisse Fraud, Plaintiffs would not have suffered these damages.

268.     But for the Credit Suisse Fraud, Plaintiffs would not have transferred funds in payment of down payments and mortgage payments in connection with the purchase of GSM lots.

269.     Plaintiffs were each damaged in an amount that includes the amounts paid as a down payment, cash paid at closing, interest paid at closing, tax stamps, loan fees, property taxes paid to date, mortgage payments to date, property taxes still owed and mortgage amounts still owed. The exact amount of each Plaintiff's damages will be proven at trial.

270.     The 2007 CSCF Default Fraud damaged Plaintiffs because Plaintiffs would have discontinued making payments under their GSM lot loans if they had known about the 2007 CSCF Default Fraud.

271.    The 2007 CSCF Default Fraud damaged Plaintiffs because Plaintiffs would have instituted legal action in 2007 to recover their damages if they had known about the 2007 CSCF Default Fraud.

272.    The 2008 CSCF Default Fraud damaged Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef and Beachfront because those Plaintiffs would have discontinued making payments under their GSM lot loans if they had known about the 2008 CSCF Default Fraud.

273.    The 2008 CSCF Default Fraud damaged Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef and Beachfront because those Plaintiffs would have instituted legal action in 2008 to recover their damages if they had known about the 2008 CSCF Default Fraud.

## FACTUAL BACKGROUND:  Ginn Financial Fraud

**XII.    June 2006 to August 2006:  Defendant Bobby Ginn Causes Defendants Ginn Financial and McCracken to Offer Prospective Purchasers Lot Financing**

274.    Defendant Bobby Ginn caused Defendant Ginn Financial to be formed in June 2005.  Defendant Ginn Financial became a licensed mortgage lender in the State of Florida on October 4, 2005.

275.    From around August 2006 through 2007, Defendant Bobby Ginn caused Defendants Ginn Financial and William McCracken to recommend to all Plaintiffs Bredahl, Bailey, Domnick, Jackson Group, Crawford Group, Clear Reef and Beachfront (collectively "Mortgagor Plaintiffs") that they could obtain 80% loan-to-value financing for GSM lot purchases through Defendant Ginn Financial.

276.     The Mortgagor Plaintiffs undertook the mortgage loan application process for GSM mortgage loans with loan officers purporting to represent Defendant Ginn Financial.

277.     Defendant Bobby Ginn caused Defendants Ginn Financial and William McCracken to provide applications to the Mortgagor Plaintiffs, order appraisals for the GSM lots being purchased by the Mortgagor Plaintiffs, underwrite and approve applications for GSM mortgage loans for the Mortgagor Plaintiffs, and provide the Mortgagor Plaintiffs with federally mandated mortgage loan disclosures.

278.     From around August 2006 through 2007, Defendant Bobby Ginn caused Defendants Ginn Financial and William McCracken to send the Mortgagor Plaintiffs a variety of loan documents, all of which indicated that Defendant Ginn Financial was the lender for the Mortgagor Plaintiffs' GSM mortgage loans

## XIII.  **December 2006 to March 2007:  Defendants Bobby Ginn, Ginn Financial and William McCracken Caused Mortgagor Plaintiffs' Mortgage Loans to Be Closed with Defendant Bahamas Sales Associate as the Lender Rather Than Ginn Financial**

279.     Defendant Ginn Financial did not actually close on any GSM mortgage loans with those Mortgagor Plaintiffs who went through the loan application process with Defendant Ginn Financial.

280.     Instead, Defendants Bobby Ginn, Ginn Financial and William McCracken caused Defendant Bahamas Sales Associate to be formed in August 2006 for the purpose of closing on those GSM mortgage loans provided to the Mortgagor Plaintiffs who had gone through the loan application and disclosure process with Defendant Ginn Financial.

59

281.    At the times Defendant Bahamas Sales closed on the mortgage loans with the Mortgagor Plaintiffs, Defendant Bahamas Sales was not a licensed mortgage lender, correspondent mortgage lender or mortgage broker in any state.

**XIV.    October 2006: Defendant Bobby Ginn Causes Defendants Ginn Financial and McCracken to Attempt to Influence an Independent Appraiser to Provide Inflated Appraisals for GSM Lots**

282.    Defendant Bobby Ginn caused Defendants Ginn Financial and William McCracken to suborn the preparation of fraudulently inflated appraisals as part of the underwriting process for Mortgagor Plaintiffs' GSM mortgage loans.

283.    In the fall of 2006, Robert C. Allen, who is a principal owner of Pomeroy Appraisal Associates ("Pomeroy Appraisal"), was contacted by Defendant William McCracken.  Defendant McCracken indicated that he was from Defendant Ginn Financial and that Defendant Ginn Financial was looking for a firm to provide appraisals for lots in GSM. Mr. Allen, along with his partner, was involved in a series of communications between Defendant Ginn Financial and Pomeroy Appraisal relating to appraisals for lots in GSM.

284.    In his communications with Defendant Ginn Financial, Mr. Allen usually spoke with Defendant McCracken (who indicated that he was the CEO of Defendant Ginn Financial), Mark Cook (who indicated he was the CFO of Defendant Ginn Financial) and others from Defendant Ginn Financial.

285.    A short time after Mr. Allen's initial conversation with Defendant McCracken, Defendant Ginn Financial flew the Pomeroy Appraisal partners to the Bahamas on a Ginn corporate jet for a 1-day trip to meet with various Ginn sales and development people.

286.    Shortly after Pomeroy Appraisal's return from that first trip, they had a telephone conference with Defendant Ginn Financial. During that call they spoke with Defendant McCracken about the scope of the engagement and agreed upon Pomeroy Appraisal's charges for conducting appraisals. At that time, Defendant Ginn Financial engaged Pomeroy Appraisal to provide appraisals for lots in GSM, and Pomeroy Appraisal subsequently received several requests for appraisals from Defendant Ginn Financial.

287.    Subsequent to its retention by Defendant Ginn Financial, Pomeroy Appraisal made an investigatory trip to the Bahamas to evaluate the real estate market, evaluate GSM, inspect comparable sales properties and speak with local realtors.

288.    Upon returning from its first investigatory trip to Grand Bahama, Pomeroy Appraisal received many additional requests from Defendant Ginn Financial for lot appraisals in GSM. Each of the appraisal requests that Pomeroy Appraisal received from Defendant Ginn Financial included a sales price for the lot in question. In addition, many of the appraisal requests included an "Estimated Value" figure for the lot to be appraised.

289.    Defendant Ginn Financial informed Pomeroy Appraisal that the lot sales price was the target value for the appraisals to be issued by Pomeroy Appraisal. In response to the Request for Appraisal Forms and the oral request from Defendant Ginn Financial that Pomeroy Appraisal use the lot sales price as the target value for appraisals, Pomeroy Appraisal informed the Ginn Financial Representatives that Pomeroy Appraisal's analysis would not be based on any predetermined target value, estimate or contract price. Pomeroy Appraisal further informed Ginn Financial that the market value

as determined by Pomeroy Appraisal's appraisals would be based only upon Pomeroy Appraisal's investigation and analysis.

290.    After Pomeroy Appraisal began putting together a rough analysis for the GSM lot appraisals, Mr. Allen and his partner had a telephone conference with Defendant McCracken and others from Defendant Ginn Financial. Pomeroy Appraisal discussed with Defendant Ginn Financial how lot prices in GSM measured up against comparable sales on Grand Bahama Island but outside of GSM ("Grand Bahama Comparables").

291.    Pomeroy Appraisal informed Defendants Ginn Financial and McCracken that the GSM lot prices were significantly higher than the sales prices for the Grand Bahama Comparables. Those on the call agreed that the Grand Bahama Comparables did not offer the amenities that Ginn was marketing for GSM. Pomeroy Appraisal informed Defendants Ginn Financial and McCracken that Pomeroy Appraisal would need to establish the difference between lots with and without the amenities that were being marketed for GSM in order to understand how to measure the Grand Bahama Comparables. Pomeroy Appraisal also informed Defendants Ginn Financial and McCracken that this would be a difficult task and that it would take some time to do this analysis.

292.    Ultimately, Pomeroy Appraisal's retention by Defendant Ginn Financial to provide appraisals for GSM lots lasted a month or less. During the course of Pomeroy Appraisal's efforts to provide a complete and fully supported analysis in order to determine the appropriate appraised value for GSM lots, Pomeroy Appraisal had disagreements with Defendants Ginn Financial and McCracken over several issues.

293.    One area of disagreement related to the timing of the appraisals.
Defendants Ginn Financial and McCracken pressured Pomeroy Appraisal to provide

them with the appraisals very quickly. Pomeroy Appraisal told Defendants Ginn

Financial and McCracken that Pomeroy Appraisal couldn't produce the appraisals

without first undertaking a complete investigation and analysis of the market. Pomeroy

Appraisal explained that without a complete investigation and analysis, Mr. Allen and his

partner would not consider themselves competent in the area and would not be able to

provide appraisals.

294.    A second area of disagreement related to the issue of what comparable

sales were appropriate for use in conducting Pomeroy Appraisal's appraisals of GSM

lots. Pomeroy Appraisal informed Defendants Ginn Financial and McCracken that, as

part of Pomeroy Appraisal's complete investigation and analysis, Pomeroy Appraisal

would need to consider comparable lot sales on Grand Bahama Island but outside of

GSM.

295.    In response, Defendants McCracken and Cook pressured Pomeroy

Appraisal to consider the closed sales from within GSM as the only comparables and

asked why Pomeroy Appraisal needed to go outside the project when Defendant Ginn

Financial had the closed sales in GSM for Pomeroy Appraisal to use as comparables.

296.    Pomeroy Appraisal agreed to look at the closed sales within GSM in

addition to the comparables Pomeroy Appraisal had obtained from outside of GSM.

Pomeroy Appraisal informed Defendants Ginn Financial and McCracken that the

problem with using only closed sales within GSM as comparables was that many of the

buyers for those sales had been flown into the private airstrip on GSM by Ginn and had

not had an opportunity to price lots offered outside the subdivision before making their purchase decisions.

297.     Pomeroy Appraisal explained that it was not comfortable only using closed sales within GSM as comparables because Pomeroy Appraisal had not yet completed its investigation and analysis and thus did not yet understand how the Bahamian real estate marked worked.  Pomeroy Appraisal further informed Defendants Ginn Financial and McCracken that any U.S. lender would want to see an appraisal that took into account comparables from outside of GSM.

298.     In response, Defendant McCracken strongly disagreed.  In a heated conversation, Defendant McCracken informed Pomeroy Appraisal that Defendant Ginn Financial only wanted Pomeroy Appraisal to use closed sales within GSM as comparables and that Defendant Ginn Financial did not want Pomeroy Appraisal to use any comparable sales from outside of GSM.

299.     A third area of disagreement related to the issue of whether Pomeroy Appraisal could provide an "as-is" appraisal for the GSM lots.  Pomeroy Appraisal informed Defendants Ginn Financial and McCracken that if Pomeroy Appraisal agreed to consider closed sales from within GSM as comparables, Pomeroy Appraisal's appraisals would have to indicate that they were "subject to" the completion of the infrastructure and amenities that Ginn was marketing for GSM.  Pomeroy Appraisal informed Defendants Ginn Financial and McCracken that Pomeroy Appraisal had to protect itself, and thus Pomeroy Appraisal would only agree to provide "subject to" appraisals. Pomeroy Appraisal made it clear that if Defendants Ginn Financial and McCracken

would not accept "subject to" appraisals, Pomeroy Appraisal would not provide the appraisals at all.

300.    In response, Defendants Ginn Financial and McCracken asked Pomeroy Appraisal to provide a rough draft of what Pomeroy Appraisal's appraisal would look like for several of the lots.  Pomeroy Appraisal provided the rough drafts.

301.    In a telephone conference with Defendant McCracken after they received Pomeroy Appraisal's rough drafts, Defendants Ginn Financial and McCracken asked Pomeroy Appraisal to remove the "subject to" comments from the draft appraisals. Pomeroy Appraisal refused.

302.    In response, Defendants McCracken said they would get back to Pomeroy Appraisal.  Less than an hour later, Defendants Ginn Financial and McCracken called Pomeroy Appraisal to say that Defendant Ginn Financial was "going to go in another direction."  That was Pomeroy Appraisal's last communication of any kind with Defendants Ginn Financial and McCracken.

303.    The "subject to" appraisals that Pomeroy Appraisal insisted would be the only appropriate appraisals for the GSM lots are also sometimes referred to as appraisals including "hypothetical conditions."  For this type of appraisal, the appraised value remains hypothetical until the "subject to" condition is fully satisfied.

304.    Even after the condition has reportedly been satisfied, it is necessary for this type of appraisal for the appraiser to return to the subject property to reevaluate its value in light of the satisfaction of condition.  Taking into account the satisfaction of condition and other variables existing at the time of the reevaluation, the appraiser will

then issue a final appraised value for the property, which may be higher or lower than the "subject to" value. Only the final appraised value is a valid value for lending purposes.

305.    Based upon the investigation Pomeroy Appraisal conducted on its first investigatory trip to Grand Bahama Island, and taking into account the comparable sales outside of GSM, Pomeroy Appraisal determined that the value of a GSM lot on an appraisal that was not made "subject to" completion of the infrastructure and amenities marketed for GSM would have been significantly less than the sales prices that were set for GSM lots.

306.    Subsequent to terminating the agreement with Pomeroy Appraisal, Defendants Ginn Financial, Bahamas Sales Associate and McCracken retained an appraiser in the Bahamas, W. Carver Grant & Co. LTD, to provide appraisals of the lots purchased by the Mortgagor Plaintiffs.

307.    The W. Carver Grant & Co. appraisals for GSM lots included the following statement: "The referenced lot is situated in the Ginn Sur Mer development at the West End, Grand Bahama. This development will comprise of world-class marinas, spa, hotel, casino, and beach club and restaurant facilities planned to occupy to 2,000 plus acre site. In addition to those features previously listed estate home sites are planned along the shore, canals and signature golf courses. The plans are extensive and the development is envisioned to cater to the wealthy and affluent boaters and second home buyers from around the world."

308.    The W. Carver Grant & Co. appraisals for GSM lots included the following statement: "The subdivision is currently under construction and is anticipated

to have all the infrastructure (i.e., electricity potable water and paved roads) in place prior to being released for development."

309.    The W. Carver Grant & Co. appraisals for GSM lots included the following statement: Under "Valuation": "The Market Value of a property may be defined as the highest possible price obtainable on an 'open market' in an 'arm's length transaction', i.e. where the buyer and seller are not under duress, the advantages and disadvantages are known to both parties and the property is offered on the open market for a reasonable period of time.  The lots in this subdivision have been scheduled to sell for prices ranging from $500,000 to $1,100,000, increasing over time."

310.    The W. Carver Grant & Co. appraisals for GSM lots included the following statement, indicating they had been prepared according to the requirements provided by Defendants Ginn Financial and McCracken:  "I trust that the above report meets with your requirements."

311.    The W. Carver Grant & Co. appraisals for GSM lots failed to include any justification for the appraised value of those lots.

312.    The W. Carver Grant & Co. appraisals for GSM lots included the type of hypothetical conditions noted by Pomeroy Appraisal in its valuation, but failed to note that the appraised values would remain hypothetical until the "subject to" condition was fully satisfied.

313.    Any licensed mortgage lender within the United States should, if it is conducting appropriate due diligence in its underwriting, require that an appraisal submitted in support of a mortgage loan application comply with the Uniform Standards of Professional Appraisal Practice.

314.    Similarly, any licensed mortgage lender within the United States should, if it is required to follow guidelines set forth for Fannie Mae, Freddie Mac, FHA or VA loans, require that an appraisal submitted in support of a mortgage loan application comply with the Uniform Standards of Professional Appraisal Practice.

315.    Defendant Bobby Ginn caused Defendants Ginn Financial, Bahamas Sales and William McCracken to utilize inflated and unsupported appraisals that did not comply with the Uniform Standards of Professional Appraisal Practice to justify the sale and financing of Plaintiffs' GSM lot purchases at inflated prices based upon marketed amenities that did not exist at the time of the appraisals.

316.    Defendant Bobby Ginn caused Defendants Ginn Financial, Bahamas Sales and William McCracken to ensure that GSM mortgage loans were approved and that money was disbursed at the closing of GSM lot sales, notwithstanding their knowledge of the use of inflated and unsupported appraisals.

## XV.  The Mortgagor Plaintiffs Were Damaged by the Appraisal Fraud Scheme

317.    Defendant Bobby Ginn caused Defendants Ginn Financial, Bahamas Sales and William McCracken to fraudulently conceal their scheme to utilize inflated and unsupported appraisals in support of GSM mortgage loans and to justify inflated sales prices for all GSM lots

318.    Mortgagor Plaintiffs did not discover the Appraisal Fraud Scheme, or that Defendants Ginn Financial, Bahamas Sales, William McCracken and Mark Cook had fraudulently concealed that scheme, until early 2010.

319.    The appraised value of the GSM lots, as set forth in the inflated and unsupported appraisals, was or should have been material to the underwriting decision whether to approve the GSM mortgage loans.

320.     Defendants Bobby Ginn, Ginn Financial, Bahamas Sales, Ginn Title and William McCracken all received a direct benefit from the Appraisal Fraud Scheme.

321.     In the course of accepting, underwriting, approving and issuing financing for GSM lot purchases, Defendants Bobby Ginn, Ginn Financial, Bahama Sales Associate and William McCracken had a duty to ensure that the GSM lot appraisal supporting the loan was accurate and was conducted in compliance with the Uniform Standards of Professional Appraisal Practice.

322.     In the course of accepting, underwriting, approving and issuing financing for GSM lot purchases, Defendants Bobby Ginn, Ginn Financial, Bahama Sales Associate and William McCracken had a further duty to act in good faith and with fair dealing in any transaction, practice or course of business associated with the issuance of GSM mortgage loans.

323.     As a result, Defendants Bobby Ginn, Ginn Financial, Bahama Sales Associate and William McCracken had a duty not to suborn mischaracterization of the appraised value of any GSM lot securing a GSM mortgage loan.

324.     Plaintiffs had a right to rely and did rely on Defendants Bobby Ginn, Ginn Financial, Bahama Sales Associate and William McCracken to meet the duties outlined in Paragraphs 313-314 and 321-322.

325.     But for the Appraisal Fraud Scheme perpetrated by Defendants Bobby Ginn, Ginn Financial, Bahama Sales Associate and William McCracken, Plaintiffs would not have purchased GSM lots or would not have purchased GSM lots at the fraudulently inflated prices.

326.     But for the Appraisal Fraud Scheme perpetrated by Defendants Bobby Ginn, Ginn Financial, Bahama Sales Associate and William McCracken, the GSM

mortgage loans for the Mortgagor Plaintiffs should not have been approved for the fraudulently inflated sales prices of the GSM lots.

327.    The Appraisal Fraud Scheme damaged Plaintiffs. At the moment the Mortgagor Plaintiffs closed on their GSM lot purchases, those Plaintiffs were saddled with mortgage loans with a debt to equity ratio far in excess of 100% because those mortgage loans were made for amounts far in excess of the true market value of the GSM lots at the time of their purchase.

328.    At the moment all Plaintiffs closed on their GSM lot purchases, they were saddled with lots for which they had grossly overpaid.

329.    At the moment all Plaintiffs closed on their GSM lot purchases, the amount of property taxes on their GSM lots began to accrue based upon the fraudulently inflated purchase price for those lots. The Bahamian government continues to calculate Plaintiffs' property taxes based on the inflated prices Plaintiffs paid for their GSM lots.

330.    At the moment Plaintiffs closed on their GSM lot purchases, they were saddled with lots that were virtually unmarketable except at prices significantly below the inflated prices Plaintiffs had paid for their GSM lots.

## RICO Allegations

### The Enterprise: CSCF Enterprise

331.    Plaintiffs and Defendants Lubert-Adler, Lubert-Adler Fund III, Lubert-Adler Fund IV, Lubert-Adler Fund V, ERG Enterprises, Ginn West End, Ginn-LA West End LLLP, Ginn-LA CS Borrower, Ginn-LA Conduit Lender, Ginn-LA OBB and Ginn-LA CS Holding are all "persons" within the meaning of 18 U.S.C. § 1961(3).

332.    Based upon Plaintiffs' current knowledge, the following persons constitute a group of individuals associated in fact that Plaintiffs refer to as the "CSCF

Enterprise":  (1) Defendant Lubert-Adler; (2) Lubert-Adler Fund III; (3) Lubert-Adler Fund IV; (4) Lubert-Adler Fund V; (5) Defendant Ginn West End; (5) Defendant Ginn-LA West End LLLP; (7) Defendant Ginn-LA CS Borrower; (8) Defendant Ginn-LA Conduit Lender; (9) Defendant Ginn-LA OBB; (10) Defendant ERG Enterprises; (11) Defendant Ginn-LA CS Holding and (12) other persons presently unknown to Plaintiffs (collectively "CSCF Defendants").

333.     The CSCF Enterprise is an ongoing organization that engages in, and which activities affect, interstate and foreign commerce.  At all time relevant to the allegations herein, the CSCF Defendants did knowingly and willfully make use of the means and instruments of transportation and communications of interstate and foreign commerce to communicate with one another, with Credit Suisse; with Cushman & Wakefield, with Standard & Poor's, with prospective purchasers of lots in GSM, with plaintiffs and with the general public.

334.     Although the CSCF Defendants participate in and are members and part of the CSCF Enterprise, each the CSCF Defendants also has an existence separate and apart from the CSCF Enterprise.

335.     At all relevant times, the CSCF Enterprise has had an ascertainable structure separate and apart from the pattern of racketeering activity in which the CSCF Defendants have engaged and their conspiracy to engage in such activity.  The primary decision-makers for the CSCF Enterprise are Bobby Ginn and Dean Adler, as well as Defendants Lubert-Adler and ERG Enterprises, who directed and continue to direct the activities of the CSCF Enterprise.

336.    The CSCF Defendants control and operate the CSCF Enterprise through a variety of means including, but not limited to, the following:

a.  by investing funds to develop GSM;

b.  by agreeing to create and creating Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender in order to secure the CSCF;

c.  by providing speculative, unreasonable and unsupported CSCF Project Projections to GSM in support of the TNV "appraisal" necessary to obtain the CSCF;

d.  by amending the Heads of Agreement with the Bahamian government to include 1020 additional GSM residential lots and 500 additional GSM condominiums necessary to match the CSCF Project Projections provided to GSM;

e.  by secretly securing the CSCF;

f.  by secretly providing a $333 million distribution to Defendants Lubert-Adler and ERG Enterprises from the CSCF;

g.  by secretly authorizing the use of the vast majority of the remaining proceeds from the CSCF for the development of subdivisions other than GSM;

h.  by collateralizing the $675 million CSCF across five CSCF Developments;

i.  by pledging the GSM land as security for the CSCF;

j.  by pledging the ownership interests in Defendants Ginn-LA West End LLLP and Ginn West End as security for the CSCF;

k.  by concealing the existence and terms of the $675 million CSCF from prospective and actual purchasers in GSM, including Plaintiffs;

l.  by concealing the 2007 Initial CSCF Default from prospective and actual purchasers in GSM, including Plaintiffs;

m.  by concealing the existence and terms of the 2007 CSCF Restructure from prospective and actual purchasers in GSM, including Plaintiffs;

n.  by concealing the impact of the 2007 CSCF Restructure from prospective and actual purchasers in GSM, including Plaintiffs;

o.  by concealing the HUD Suspension from prospective and actual purchasers in GSM, including Plaintiffs;

p.  by authorizing fraudulent and misleading statements about the Final CSCF Default to plaintiffs and the general public;

q.  by concealing the existence and terms of the 2008 Master Restructure from prospective and actual purchasers in GSM, including Plaintiffs;

r.  by concealing the impact of the Final CSCF Default and 2008 Master Restructure from prospective and actual purchasers in GSM, including Plaintiffs;

s.  by concealing the GSM Foreclosure from prospective and actual purchasers in GSM, including Plaintiffs;

t.  by concealing the impact of the GSM Foreclosure and 2008 Master Restructure from prospective and actual purchasers in GSM, including Plaintiffs;

u.  by agreeing to conceal and concealing their fraudulent scheme to engage in the CSCF Fraud.

337.    The CSCF Enterprise has pursued a course of deceit, misrepresentation, concealment and conspiracy to defraud Plaintiffs and to collect profits from the fraudulent, misleading and unlawful actions of the CSCF Enterprise. Those actions began before Plaintiffs purchased their GSM lots, continue to the present and threaten to continue into the future.

338.    The formation, existence and actions of the CSCF Enterprise were and are essential to the success of its fraudulent, misleading and unlawful actions.

**Predicate Acts- Mail, Wire and Bank Fraud:  CSCF Enterprise**

339.    Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud), and 18 U.S.C. § 1344 (relating to bank fraud).  CSCF Defendants have engaged and continue to engage in conduct violating each of these laws in an effort to effectuate the CSCF Fraud.

340.    For the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false or fraudulent pretenses, representations or promises, CSCF Defendants in violation of 18 U.S.C. § 1341 and 1343 did cause matter and things to be delivered by the Postal Service or by private or commercial interstate carriers.  These acts were done intentionally and knowingly with the specific intent to advance CSCF Defendants' schemes, or with knowledge that the use of mails would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

341.    CSCF Defendants carried out their scheme in different states within the United States and in other countries and could not have done so unless they used the Postal Service or private or commercial interstate carriers.

342.    The matter and things sent by CSCF Defendants via the Postal Service or private or commercial carrier, wire or other interstate media include, but are not limited to, the following.  To the extent that details concerning the exact dates of and persons involved in sending the following matters or things are not alleged herein, such details

are in the exclusive control of one or more of the CSCF Defendants, and/or other persons presently unknown to Plaintiffs:

a. Throughout 2006, Defendants Lubert-Adler and ERG Enterprises authorized and caused marketing materials to be sent to the general public and prospective GSM purchasers, including Plaintiffs, via the Postal Service or private or commercial carrier, wire or other interstate media.

    i. The marketing materials for GSM described it as "a $4.9 billion world-class resort community" that would include the following components: 4,400 condominium and hotel units, centered around a 20-story "grand palace"; 1,800 single family residential homesites; two signature golf courses created by Jack Nicklaus and Arnold Palmer, with two clubhouses; a "mega-yacht marina"; a "Monte Carlo-style casino" that would be "the premier casino in the islands"; water and swim pavilions; a beach club; a world-class salon and spa; nightclubs and restaurants; "world-class shopping"; a "grand canal" connecting all resort areas; gardens, fountains and pools. These representations were false and misleading because Defendants Lubert-Adler and ERG Enterprises knew that the terms of the CSCF, as outlined above, would preclude the development of GSM to include these marketed amenities.

    ii. The marketing materials for GSM included assurances from Bobby Ginn, "The fact is, we would not have compromised the integrity of our vision, nor would we have shared any plans that we weren't 100% certain we could both develop and operate to the level you've come to expect from the Ginn Clubs

& Resorts team." This representation was false and misleading because Defendants Lubert-Adler and ERG Enterprises knew that the terms of the CSCF, as outlined above, would preclude the development of GSM to include the marketed amenities.

b.  On or about March 30, 2006, Defendant Ginn-LA LLLP (through the signature of Robert Masters) executed an engagement letter with Credit Suisse for Senior Secured Credit Facilities up to $800 million, which engagement letter was sent to Credit Suisse and received from Credit Suisse via the Postal Service or private or commercial carrier, wire or other interstate media.

c.  On dates presently unknown to Plaintiffs but before March 31, 2006, Defendants Lubert-Adler, ERG Enterprises, Ginn-LA CS Borrower and Ginn-LA Conduit Lender sent communications to GSM via the Postal Service or private or commercial carrier, wire or other interstate media in the form of the CSCF Project Projections and other related information relating to the projections of future lot sales in the CSCF Developments.  This information was speculative, overstated and unsupported by historical information.  This information was intended to cause GSM to issue TNV "appraisals" for each of the CSCF Developments in amounts that would justify the $675 million CSCF.

d.  On or about April 18, 2006, Defendants Lubert-Adler and ERG Enterprises caused information to be sent to the Delaware Department of State, Division of Corporations via the Postal Service or private or commercial carrier, wire or other interstate media for the formation of Defendant Ginn-LA CS Borrower.

Defendant Ginn-LA CS Borrower was formed for the sole purpose of acting as a borrower under the CSCF.

e. On or about May 5, 2006, Defendants Lubert-Adler and ERG Enterprises caused information to be sent to the Delaware Department of State, Division of Corporations via the Postal Service or private or commercial carrier, wire or other interstate media for the formation of Defendant Ginn-LA Conduit Lender. Defendant Ginn-LA Conduit Lender was formed for the sole purpose of acting as a borrower under the CSCF.

f. On dates presently unknown to Plaintiffs but before May 10, 2006, Defendants Lubert-Adler, ERG Enterprises, Ginn-LA CS Borrower and Ginn-LA Conduit Lender sent communications to Credit Suisse Securities (USA) LLC via the Postal Service or private or commercial carrier, wire or other interstate media authorizing Credit Suisse to act as sole arranger for the CSCF.

g. On or about May 10, 2006, Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender (through the signatures of Chairman, CEO and President Bobby Ginn), sent to Credit Suisse Securities (USA) LLC via the Postal Service or private or commercial carrier, wire or other interstate media a Company Authorization letter that was intended to be included in a Confidential Information Memorandum on the CSCF.

h. On dates presently unknown to Plaintiffs but before May 10, 2006, Defendants Lubert-Adler, ERG Enterprises and Ginn-LA West End LLLP did cause information to be sent to Credit Suisse Securities (USA) LLC via the Postal Service or private or commercial carrier, wire or other interstate media, for

purposes of inclusion in a Confidential Information Memorandum on the CSCF. Such information included but was not limited to Property Overviews for each of the CSCF Developments; background information on Defendant Lubert-Adler and its prior investment in Ginn developments; background information on The Ginn Companies and their prior developments; financial information on the sources and uses of the CSCF; a debt repayment summary; and information on the legal structure and ownership of the entities involved in the CSCF, including Defendants Lubert-Adler, ERG Enterprises, Ginn West End, Ginn-LA Conduit Lender, Ginn-LA CS Borrower, and Ginn-LA West End LLLP, as well as the individual partnerships acting as the developers for the CSCF Developments.

i.   On or about May 10, 2006 Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender requested that the Confidential Information Memorandum be distributed "to such financial institutions as you may deem appropriate to include in the Credit Facilities," with knowledge that the Confidential Information Memorandum would be transmitted via the Postal Service or private or commercial carrier, wire or other interstate media.

j.   On dates presently unknown to Plaintiffs but before May 10, 2006, Defendants Lubert-Adler, ERG Enterprises and Ginn-LA West End LLLP did cause Powers of Attorney for the purchase of GSM lots to be sent to prospective GSM purchasers via the Postal Service or private or commercial carrier, wire or other interstate media. These Defendants intended to induce prospective purchasers to execute the Powers of Attorney and submit $50,000 deposits for GSM lots without informing any prospective purchasers about the $675 million CSCF. These Defendants

intended to utilize the executed Powers of Attorney and $50,000 deposits to submit to Credit Suisse as evidence of impending lot sales in GSM as part of these Defendants' efforts to obtain the CSCF.

k. On dates presently unknown to Plaintiffs but before May 10, 2006, Defendants Lubert-Adler, ERG Enterprises and Ginn-LA West End LLLP did receive executed Powers of Attorney for the purchase of GSM lots, along with $50,000 deposits, from prospective GSM purchasers via the Postal Service or private or commercial carrier, wire or other interstate media. These Defendants intended to utilize the executed Powers of Attorney and $50,000 deposits to submit to Credit Suisse as evidence of impending lot sales in GSM as part of these Defendants' efforts to obtain the CSCF.

l. On dates presently unknown to Plaintiffs but before May 10, 2006, Defendants Lubert-Adler, ERG Enterprises and Ginn-LA West End LLLP did cause marketing and other communications to be sent to prospective GSM purchasers via the Postal Service or private or commercial carrier, wire or other interstate media. These Defendants used such communications to induce prospective purchasers to execute reservation agreements for GSM lots and to pay $1,000-$2,000 deposits to secure such lot reservations without informing any prospective purchasers about the $675 million CSCF. These Defendants intended to utilize the lot reservation agreements and deposits to submit to Credit Suisse as evidence of impending lot sales in GSM as part of these Defendants' efforts to obtain the CSCF.

m. On dates presently unknown to Plaintiffs but before May 10, 2006, Defendants Lubert-Adler, ERG Enterprises and Ginn-LA West End LLLP did receive

executed GSM lot reservation agreements, along with $1,000-$2,000 deposits, from prospective GSM purchasers via the Postal Service or private or commercial carrier, wire or other interstate media. These Defendants intended to utilize the lot reservation agreements and deposits to submit to Credit Suisse as evidence of impending lot sales in GSM as part of these Defendants' efforts to obtain the CSCF.

n. On dates presently unknown to Plaintiffs but before May 16, 2006, Defendants Lubert-Adler, ERG Enterprises and Ginn-LA West End LLLP did cause financial and other information on the terms of the CSCF and on Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender to be sent to the rating agency Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media. These Defendants intended this information to induce Standard & Poor's to provide credit ratings for Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender that would support the issuance of the CSCF. These Defendants provided this information to Standard & Poor's with knowledge that it would be used for ratings statements that would be transmitted via the Postal Service or private or commercial carrier, wire or other interstate media to Credit Suisse, to other parties involved in the CSCF, and to Standard & Poor's subscribers.

o. On or about May 16, 2006, Defendants Lubert-Adler, ERG Enterprises, Ginn-LA West End LLLP, Ginn-LA CS Borrower and Ginn-LA Conduit Lender received from Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media, a document entitled "Research Update: Issuer

Credit, Bank Loan Ratings Assigned to Ginn-LA CS Borrower and Ginn-LA Conduit Lender."

p.  On June 8, 2006, Defendants Lubert-Adler and ERG Enterprises did cause the initial developer of GSM (Ginn-LA West End Limited) to execute an Amendment to the Heads of Agreement with the Bahamian government, with knowledge that it would be transmitted via the Postal Service or private or commercial carrier, wire or other interstate media to other signatories of the agreement for execution in counterparts. This Amendment to the Heads of Agreement increased the number of residential lots from 870 to 1,890 and the number of condominium units from 4,400 to 4,900 in order to match the CSCF Project Projections provided to GSM.

q.  On June 8, 2006, Defendants Lubert-Adler and ERG Enterprises did cause Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender to execute a $525 Million Senior First Lien Credit Facility with Credit Suisse, Cayman Islands Branch and Credit Suisse Securities (USA) LLC, with knowledge that it would be transmitted via the Postal Service or private or commercial carrier, wire or other interstate media to other signatories of the agreement for execution in counterparts.

r.  On June 8, 2006, Defendants Lubert-Adler and ERG Enterprises did cause Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender to execute a $150 Million Senior Second Lien Credit Facility with Credit Suisse, Cayman Islands Branch and Credit Suisse Securities (USA) LLC, with knowledge that it would be transmitted via the Postal Service or private or commercial carrier, wire or other interstate media to other signatories of the agreement for execution in counterparts.

s.  On June 8, 2006, Defendants Lubert-Adler and ERG Enterprises did cause Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender to execute a Disbursement Authorization letter sent to Credit Suisse Cayman Islands via the Postal Service or private or commercial carrier, wire or other interstate media. The Disbursement Authorization instructed and authorized Credit Suisse to disburse a total of $510 million via wire to several different banks in the United States, the Bahamas and the Caribbean. The Disbursement Authorization authorized, among other payments, the $333 million distribution to Defendants Lubert-Adler and ERG Enterprises, and payments of the project expenses of CSCF Developments other than GSM. Of the $510 million covered by the Disbursement Authorization, only 2% was authorized to pay the existing indebtedness of GSM.

t.  On June 8, 2006, Defendants Lubert-Adler, Lubert-Adler Fund III, Lubert-Adler Fund IV, Ginn-LA CS Holding and ERG Enterprises did cause Defendants Ginn West End to execute a Pledge Agreement and Limited Recourse Guaranty (First Lien) on behalf of Defendant Ginn-LA West End LLLP, with knowledge that it would be transmitted via the Postal Service or private or commercial carrier, wire or other interstate media to other signatories of the agreement for execution in counterparts. With the Pledge Agreement, Defendant Ginn-LA West End LLLP guaranteed the obligations under the $675 million CSCF by a pledge of 65% of its interests in Ginn-LA International Business Company, Ltd. and 100% of its interests as the sole owner of Defendant Ginn-LA Conduit Lender, including its management and control rights in both entities.

u.  On June 8, 2006, Defendants Lubert-Adler, Lubert-Adler Fund III, Lubert-Adler Fund IV, Ginn-LA CS Holding and ERG Enterprises did cause Defendants Ginn West End to execute a Pledge Agreement and Limited Recourse Guaranty (Second Lien) on behalf of Defendant Ginn-LA West End LLLP, with knowledge that it would be transmitted via the Postal Service or private or commercial carrier, wire or other interstate media to other signatories of the agreement for execution in counterparts.  With the Pledge Agreement, Defendant Ginn-LA West End LLLP guaranteed the obligations under the $675 million CSCF by a pledge of 65% of its interests in Ginn-LA International Business Company, Ltd. and 100% of its interests as the sole owner of Defendant Ginn-LA Conduit Lender, including its management and control rights in both entities.

v.  On or about June 9, 2006, Defendants Lubert-Adler, ERG Enterprises and Ginn-LA Conduit Lender sent to an agent in the Bahamas via the Postal Service or private or commercial carrier, wire or other interstate media a Supplemental Debenture for $276,750,000 between Ginn-LA West End Ltd and Defendant Ginn-LA Conduit Lender for recording at the Registry of Records in the City of Nassau in the Commonwealth of the Bahamas.

w.  On or about June 9, 2006, Defendants Lubert-Adler, ERG Enterprises and Ginn-LA Conduit Lender sent to an agent in the Bahamas via the Postal Service or private or commercial carrier, wire or other interstate media a Promissory Note for $276,750,000 between Ginn-LA West End Limited and Defendant Ginn-LA Conduit Lender for recording at the Registry of Records in the City of Nassau in the Commonwealth of the Bahamas.

x.  On dates presently unknown to Plaintiffs but before March 27, 2007, Defendants Lubert-Adler, ERG Enterprises and Ginn-LA West End LLLP did cause financial and other information on the CSCF and on Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender to be sent to the rating agency Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media. These Defendants intended this information to induce Standard & Poor's to provide credit ratings for Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender that would support the issuance of the CSCF.  These Defendants provided this information to Standard & Poor's with knowledge that it would be used for ratings statements that would be transmitted via the Postal Service or private or commercial carrier, wire or other interstate media to Credit Suisse, to other parties involved in the CSCF, and to Standard & Poor's subscribers.

y.  On or about March 27, 2007, Defendants Lubert-Adler, ERG Enterprises, Ginn-LA West End LLLP, Ginn-LA CS Borrower and Ginn-LA Conduit Lender received from Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media, a document entitled "Ginn-LA Ratings on Watch Neg; Exposure to Florida's Soft Resort Real Estate Market Cited."

z.  On dates presently unknown to Plaintiffs but before May 1, 2007, Defendants Lubert-Adler, ERG Enterprises and Ginn-LA West End LLLP did cause financial and other information on the CSCF and on Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender to be sent to the rating agency Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media. These Defendants intended this information to induce Standard & Poor's to

provide credit ratings for Defendants Ginn-LA CS Borrower and Ginn-LA
Conduit Lender that would support the issuance of the CSCF. These Defendants
provided this information to Standard & Poor's with knowledge that it would be
used for ratings statements that would be transmitted via the Postal Service or
private or commercial carrier, wire or other interstate media to Credit Suisse, to
other parties involved in the CSCF, and to Standard & Poor's subscribers.

aa.  On or about May 1, 2007, Defendants Lubert-Adler, ERG Enterprises, Ginn-LA
West End LLLP, Ginn-LA CS Borrower and Ginn-LA Conduit Lender received
from Standard & Poor's via the Postal Service or private or commercial carrier,
wire or other interstate media, a document entitled "Ginn-LA Ratings Lowered on
Weak Sales and Diminished Recovery Prospects; Still on Watch Neg."

bb.  On or about July 16, 2007, in connection with the 2007 CSCF Default and
Restructure, Defendants Ginn-LA OBB, Lubert-Adler and Lubert-Adler Fund V
applied for irrevocable standby line of credit from JP Morgan Chase Bank in the
amount of $35.6 million ("JP Morgan Line of Credit"), which application was sent
to JP Morgan via the Postal Service or private or commercial carrier, wire or other
interstate media.

cc.  On or about July 19, 2007, Defendants Lubert-Adler and Lubert-Adler Fund V
caused JP Morgan to issue a July 19, 2007 Letter of Credit Deutsche Bank as
Beneficiary, which Letter of Credit was sent to Deutsche Bank via the Postal
Service or private or commercial carrier, wire or other interstate media. The JP
Morgan Line of Credit was intended to fund the construction of a golf course at
GSM. Notwithstanding the August 2008 assurance given by Bobby Ginn that

Ginn and Defendant Lubert-Adler had, in 2006, created and funded a "bankruptcy protected" escrow account to insure the completion of GSM infrastructure and a GSM golf course, the JPMorgan Line of Credit was necessary because Ginn and Lubert-Adler never created such escrow account in 2006 and did not have funds set aside in escrow for the completion of the GSM golf course.

dd.    On or about July 16, 2007, in connection with the 2007 CSCF Default and Restructure, Defendants Lubert-Adler and Lubert-Adler Fund IV applied for an irrevocable standby line of credit from Barclays Bank in the amount of $109.1 million ("Barclays Line of Credit") which application was sent to Barclays via the Postal Service or private or commercial carrier, wire or other interstate media.

ee.    On or about July 20, 2007, Defendants Lubert-Adler and Lubert-Adler Fund IV caused Barclays to issue a July 20, 2007 Letter of Credit Deutsche Bank as Beneficiary, which Letter of Credit was sent to Deutsche Bank via the Postal Service or private or commercial carrier, wire or other interstate media.  The Barclays Line of Credit was intended to fund the construction of infrastructure in GSM.  Notwithstanding the August 2008 assurance given by Bobby Ginn that Ginn and Defendant Lubert-Adler had, in 2006, created and funded a "bankruptcy protected" escrow account to insure the completion of GSM infrastructure and a GSM golf course, the Barclays Line of Credit was necessary because Ginn and Lubert-Adler never created such escrow account in 2006 and did not have funds set aside in escrow for the completion of the GSM infrastructure.

ff.    On or about July 17, 2007, in connection with the 2007 CSCF Default and Restructure, Defendant Ginn West End executed a Security Agreement in

connection with the Barclays Line of Credit, which Security Agreement was sent to Barclays via the Postal Service or private or commercial carrier, wire or other interstate media.

gg.  On dates unknown to Plaintiffs but after July 20, 20078, Defendant Ginn-LA OBB made one or more requests for draws on the JPMorgan Line of Credit via facsimile, wire or other interstate media.  These draws were necessary to fund the construction of the GSM golf course.  Notwithstanding the August 2008 assurance given by Bobby Ginn that Ginn and Defendant Lubert-Adler had, in 2006, created and funded a "bankruptcy protected" escrow account to insure the completion of GSM infrastructure and a GSM golf course, draws on the JPMorgan Line of Credit were necessary because Defendant Lubert-Adler took out lines of credit from Barclays Bank and JP Morgan Bank in June 2007 for the infrastructure and golf course development.

hh.  On dates unknown to Plaintiffs but after July 20, 2007, Defendant Lubert-Adler made one or more requests for draws on the Barclays Line of Credit via facsimile, wire or other interstate media.  These draws were necessary to fund the construction of the GSM infrastructure.  Notwithstanding the August 2008 assurances given by Bobby Ginn that Ginn and Defendant Lubert-Adler had, at the time of the June 8, 2006 CSCF closing, created and funded a "bankruptcy protected" escrow account to insure the completion of GSM infrastructure and a GSM golf course, draws on the Barclays Line of Credit were necessary because Defendant Lubert-Adler took out lines of credit from Barclays Bank and JP Morgan Bank in June 2007 for the infrastructure and golf course development.

ii.    On or about July 20, 2007, in connection with the 2007 CSCF Default and
Restructure, Defendants Lubert-Adler, ERG Enterprises and Ginn-LA OBB
caused the initial developer of GSM (Ginn-LA West End Limited) to convey to
Defendant Ginn-LA OBB those portions of the GSM Land that were designated
for the GSM Resort Core, with knowledge that the documents executed in
connection with this purchase would be transmitted via the Postal Service or
private or commercial carrier, wire or other interstate media to other signatories of
the agreement for execution in counterparts, to Credit Suisse and to other parties
involved with the CSCF.  The fact that the GSM Resort Core land had been
conveyed to Defendant Ginn-LA OBB was concealed from GSM prospective and
actual purchasers, including Plaintiffs.

jj.    On or about July 20, 2007, in connection with the 2007 CSCF Default and
Restructure, Defendant Ginn-LA OBB entered into an Assignment Regarding
Heads of Agreement with the initial developer of GSM, with knowledge that it
would be transmitted via the Postal Service or private or commercial carrier, wire
or other interstate media to other signatories of the agreement for execution in
counterparts, to Credit Suisse and to other parties involved with the CSCF.  The
Assignment Regarding Heads of Agreement assigned to Defendant Ginn-LA
OBB, in exchange for $10.00, certain of the rights, benefits and obligations under
the Heads of Agreement with the Bahamian government, including but not limited
to an exclusive assignment of all rights relating to the gaming license of the GSM
casino.  The fact that rights under the Heads of Agreement, including but not
limited to rights relating to the gaming license for the GSM casino, were assigned

to Defendant Ginn-LA OBB, was concealed from GSM prospective and actual purchasers, including Plaintiffs.

kk.   On or about July 20, 2007, in connection with the 2007 CSCF Default and Restructure, Defendants Lubert-Adler (through Dean Adler, as a Director of the initial GSM developer (Ginn-LA West End Limited)) and ERG Enterprises (through Bobby Ginn, as a Director of Ginn-LA West End Limited) executed a Written Consent of the Board of Directors of Ginn-LA West End Limited, with knowledge that it would be transmitted via the Postal Service or private or commercial carrier, wire or other interstate media to other signatories of the agreement for execution in counterparts.  The Written Consent acknowledged that: (1) GSM had been encumbered as security for the $675 million CSCF; (2) the CSCF Borrowers had defaulted under the CSCF; and (3) as part of the 2007 CSCF Restructure following the 2007 CSCF Initial Default, the initial developer of GSM had conveyed the GSM Resort Core to Defendant Ginn-LA OBB.  All of these facts were being concealed from GSM prospective and actual purchasers, including Plaintiffs.

ll.  On dates presently unknown to Plaintiffs but before January 11, 2008, Defendants Lubert-Adler, ERG Enterprises and Ginn-LA West End LLLP did cause financial and other information on the CSCF and on Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender to be sent to the rating agency Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media. These Defendants intended this information to induce Standard & Poor's to provide credit ratings for Defendants Ginn-LA CS Borrower and Ginn-LA

Conduit Lender that would support the issuance of the CSCF. These Defendants provided this information to Standard & Poor's with knowledge that it would be used for ratings statements that would be transmitted via the Postal Service or private or commercial carrier, wire or other interstate media to Credit Suisse, to other parties involved in the CSCF and to Standard & Poor's subscribers.

mm.    On or about January 11, 2008, Defendants Lubert-Adler, ERG Enterprises, Ginn-LA West End LLLP, Ginn-LA CS Borrower and Ginn-LA Conduit Lender received from Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media, a document entitled "Ginn-LA Corporate Credit and Bank Loan Ratings Lowered and Off Watch; Outlook Negative."

nn.  On dates presently unknown to Plaintiffs but before January 14, 2008, Defendants Lubert-Adler, ERG Enterprises and Ginn-LA West End LLLP did cause financial and other information on the CSCF and on Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender to be sent to the rating agency Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media. These Defendants intended this information to induce Standard & Poor's to provide credit ratings for Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender that would support the issuance of the CSCF. These Defendants provided this information to Standard & Poor's with knowledge that it would be used for ratings statements that would be transmitted via the Postal Service or private or commercial carrier, wire or other interstate media to Credit Suisse, to other parties involved in the CSCF and to Standard & Poor's subscribers.

oo.  On or about January 14, 2008, Defendants Lubert-Adler, ERG Enterprises, Ginn-LA West End LLLP, Ginn-LA CS Borrower and Ginn-LA Conduit Lender received from Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media, a document entitled "Ginn-LA's Secured Financings."

pp.  On or about January 2008, Defendants Lubert-Adler and ERG Enterprises authorized and caused Bobby Ginn to conduct a press tour in January 2008, with knowledge that Bobby Ginn's statements would be transmitted to the general public and GSM purchasers, including Plaintiffs, via the Postal Service or private or commercial carrier, wire or other interstate media. The January 2008 press tour was intended to conceal the existence and the impact of the CSCF on GSM, by spreading the word that GSM development was moving forward, that construction on 375 units was expected to begin in early summer of 2008, that construction on residential lots was expected to begin later in 2009, and that GSM would be "fully operational in our core facilities with our amenities" in five years. These representations were false and misleading because Defendants Lubert-Adler and ERG Enterprises knew that the terms of the CSCF, as outlined above, would preclude the development of GSM to include the marketed amenities. In addition, Defendants Lubert-Adler and ERG Enterprises knew that a default under the CSCF had already occurred in 2007 and that a final default under the CSCF was likely in light of the slowdown in the U.S. real estate market.

qq.  Defendants Lubert-Adler and ERG Enterprises authorized and caused a Spring 2008 edition of the *Ginn Sur Mer Living* publication to be sent to GSM purchasers

transmitted via the Postal Service or private or commercial carrier, wire or other interstate media. The publication included a front-page article entitled, "Full Speed Ahead for Ginn sur Mer," in which Bobby Ginn offered assurances that GSM was not subject to the real estate declines seen in the United States: "Even though the housing and the debt markets in the U.S. and U.K. have slipped, there is still a huge demand for The Bahamas, and we feel like this project is just hitting the market that still wants oceanfront and all of the other services that come along with it." These representations were false and misleading because Defendants Lubert-Adler and ERG Enterprises knew that the terms of the CSCF, as outlined above, would preclude the development of GSM to include the marketed amenities. In addition, Defendants Lubert-Adler and ERG Enterprises knew that a default under the CSCF had already occurred in 2007 and that a final default under the CSCF was likely in light of the slowdown in the U.S. real estate market.

rr.  On dates presently unknown to Plaintiffs but before June 24, 2008, Defendants Lubert-Adler, ERG Enterprises and Ginn-LA West End LLLP did cause financial and other information on the CSCF and on Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender to be sent to the rating agency Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media. These Defendants intended this information to induce Standard & Poor's to provide credit ratings for Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender that would support the issuance of the CSCF. These Defendants provided this information to Standard & Poor's with knowledge that it would be used for ratings statements that would be transmitted via the Postal Service or

private or commercial carrier, wire or other interstate media to Credit Suisse, to other parties involved in the CSCF and to Standard & Poor's subscribers.

ss.   On or about June 24, 2008, Defendants Lubert-Adler, ERG Enterprises, Ginn-LA West End LLLP, Ginn-LA CS Borrower and Ginn-LA Conduit Lender received from Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media, a document entitled "Ginn-LA Credit Ratings Lowered to 'CC' On Near-Term Liquidity Pressure."

tt.   On or about July 1, 2008, Defendants Lubert-Adler and ERG Enterprises authorized and caused Ginn President Robert Gidel to issue a statement concerning the Final CSCF Default ("July 1, 2008 Gidel Statement"). The July 1, 2008 Gidel Statement was intended to reassure the general public and GSM lot owners, including Plaintiffs, that the CSCF default would not impact the development of GSM.

   i.   The July 1, 2008 Gidel Statement described the CSCF as "a non-recourse $675 million credit facility." This representation was false and misleading. While the CSCF was non-recourse as to Defendants Lubert-Adler and ERG Enterprises, the CSCF was, in reality, full recourse because all of the GSM Land and the ownership rights in Defendant Ginn-LA West End LLLP were pledged as collateral for the entire $675 million CSCF.

   ii.   The July 1, 2008 Gidel Statement described the CSCF as involving only four Ginn developments: Tesoro, Quail West, Laurelmor and GSM. This representation was false. The CSCF involved five

Ginn developments, including one the Gidel Statement failed to acknowledge: the Hammock Beach River Club.

iii. The July 1, 2008 Gidel Statement reassured GSM lot owners, "Ginn-LA West End Limited previously set up accounts which contain the funds necessary to complete the infrastructure and the initial 18-hole golf course at Ginn sur Mer. These funds are not subject to the credit facility and are unaffected by the current situation, which means there will be no disruption to the continued development of the Ginn sur Mer project or the operations and development of Old Bahama Bay." This representation was false and misleading. Defendant Lubert-Adler took out lines of credit from Barclays Bank and JP Morgan Bank in June 2007 for the infrastructure and golf course development.

iv. The July 1, 2008 Gidel Statement also reassured GSM lot owners, "The properties that are owned by Ginn-LA OBB, including the resort core of the Ginn sur Mer project, are not subject to this or any other credit facility." This representation was false and misleading. The CSCF initially included all of the GSM Land. It was not until the 2007 CSCF Restructure following the 2007 CSCF Initial Default that the initial developer Ginn-LA West End sold the GSM Resort Core to Defendant Ginn-LA OBB.

uu. On dates presently unknown to Plaintiffs but before July 2, 2008, Defendants Lubert-Adler, ERG Enterprises and Ginn-LA West End LLLP did cause financial

and other information on the CSCF and on Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender to be sent to the rating agency Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media. These Defendants intended this information to induce Standard & Poor's to provide credit ratings for Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender that would support the issuance of the CSCF. These Defendants provided this information to Standard & Poor's with knowledge that it would be used for ratings statements that would be transmitted via the Postal Service or private or commercial carrier, wire or other interstate media to Credit Suisse, to other parties involved in the CSCF and to Standard & Poor's subscribers.

vv. On or about July 2, 2008, Defendants Lubert-Adler, ERG Enterprises, Ginn-LA West End LLLP, Ginn-LA CS Borrower and Ginn-LA Conduit Lender received from Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media, a document entitled "Ginn-LA Ratings cut to 'D' on Missed Principal and Interest Payments."

ww. On or about August 6, 2008, Defendants Lubert-Adler and ERG Enterprises authorized and caused Bobby Ginn to appear at a press conference to discuss the CSCF and the status of GSM development ("August 6, 2008 Bobby Ginn Statement"). The August 6, 2008 Bobby Ginn Statement was intended to reassure the general public and GSM lot owners, including Plaintiffs, that the CSCF default would not impact the development of GSM.

   i. The August 6, 2008 Bobby Ginn Statement offered reassurances that, "Under the Credit Suisse loan, there were 868 lots. Two

hundred of them have been sold and released, so they are in the hands of the independent owners that bought them. So the loan is only on the 668, and some undeveloped properties." This representation was false and misleading. The CSCF initially included all of the GSM Land. It was not until the 2007 CSCF Restructure following the 2007 CSCF Initial Default that the initial GSM developer (Ginn-LA West End Limited) sold the GSM Resort Core to Defendant Ginn-LA OBB.

ii.  The August 6, 2008 Bobby Ginn Statement offered reassurances that "when we made that [CSCF] loan, one of the things we did is we took $124 million in cash and put it into a bankruptcy protected escrow account, for the sole purpose of finishing up development in those areas. We took $36 million, and we put it in escrow for the completion of the first golf course." The August 6, 2008 Bobby Ginn Statement offered additional reassurances that "we also wanted to be sure our property owners were protected, so for the people who bought the 200 lots, we put in cash, outside of the CS loan, funded by us, these escrow accounts to finish out that block of work." These representations were false and misleading. By stating that money was in escrow for the "purpose of finishing up development" rather than stating that money was in escrow for the completion of the contractually required infrastructure, Ginn implied that money had been set aside to complete development of

the GSM marketed amenities. In addition, Defendant Lubert-Adler

took out lines of credit from Barclays Bank and JP Morgan Bank

in June 2007 for the infrastructure and golf course development.

iii.  The August 6, 2008 Bobby Ginn Statement offered reassurances

that the GSM Resort Core was "[o]utside of that credit, completely

unaffected by it." This representation was false and misleading.

The CSCF initially included all of the GSM Land. It was not until

the 2007 CSCF Restructure following the 2007 CSCF Initial

Default that the initial GSM developer (Ginn-LA West End

Limited) sold the GSM Resort Core to Defendant Ginn-LA OBB.

iv.  The August 6, 2008 Bobby Ginn Statement offered reassurances

that the CSCF was "a non-recourse loan." While the CSCF was

non-recourse as to Defendants Lubert-Adler and ERG Enterprises,

the CSCF was, in reality, full recourse because all of the GSM

Land and the ownership rights in Defendant Ginn-LA West End

LLLP were pledged as collateral for the entire $675 million CSCF.

v.  The August 6, 2008 Bobby Ginn Statement offered reassurances

that "If something goes wrong, and we're continuing to assume

that it's not, all the money to develop all of the facilities is in place.

It's there now. It's in an escrow account. You can't get any safer

than that." This representation was false and misleading. By

stating that money was in escrow "to develop all of the facilities"

rather than stating that money was in escrow for the completion of

the contractually required infrastructure, Ginn implied that money had been set aside to complete development of the GSM marketed amenities.

vi. The August 6, 2008 Bobby Ginn Statement offered reassurances that, "A hundred percent of the proceeds of the loan go to pay off Credit Suisse. So they are going to be fine. This loan is going to be fine." These representations were false and misleading because the terms of the CSCF, as outlined above, prevented the development of GSM to include the marketed amenities. In addition, a default under the CSCF had already occurred in 2007, and a final default under the CSCF was likely in light of the slowdown in the U.S. real estate market.

vii. The August 6, 2008 Bobby Ginn Statement offered reassurances that because the GSM Resort Core was outside of the CSCF, "regardless of what happens in the economy, the Grand Bahama Project is not in danger." These representations were false and misleading because the terms of the CSCF, as outlined above, prevented the development of GSM to include the marketed amenities. In addition, a default under the CSCF had already occurred in 2007, and a final default under the CSCF was likely in light of the slowdown in the U.S. real estate market.

viii. The August 6, 2008 Bobby Ginn Statement offered reassurances that, "We never want to say something that we can't back up and

we never want to sell someone something that we can't back up. We're out of business if we ever do that." These representations were false and misleading because the terms of the CSCF, as outlined above, prevented the development of GSM to include the marketed amenities. In addition, a default under the CSCF had already occurred in 2007, and a final default under the CSCF was likely in light of the slowdown in the U.S. real estate market.

xx.   On or about September 10, 2008, Defendants Lubert-Adler, ERG Enterprises and Ginn-LA West End LLLP caused to be sent to the U.S. Department of Housing and Urban Development ("HUD") via the Postal Service or private or commercial carrier, wire or other interstate media a request for the suspension of the Statements of Record filed with HUD for four of the CSCF Developments: Tesoro, Quail West, Laurelmor and GSM. The suspension of the HUD Registrations resulted in a legal prohibition on the sale of any residential lots in the affected CSCF Developments. Defendants Lubert-Adler, ERG Enterprises and Ginn-LA West End LLLP concealed from GSM lot owners, including Plaintiffs, the fact of the suspension of the HUD Registrations, as well as the legal prohibition on the sale of any residential lots in GSM. The HUD suspension came about when, as a result of the Final CSCF Default, HUD issued a directive in September 2008 "that it would administratively undertake" a suspension of the ILSA registrations filed for GSM and other CSCF Developments unless Ginn voluntarily suspended those registrations.